# 22-1765(L)

22-2774(CON), 22-1884(XAP), 22-2871(XAP), 22-2881(XAP), 22-2883(XAP)

# In the United States Court of Appeals for the Second Circuit

ENERGETIC TANK, INC., *as Owner of the M/V ALNIC MC, for Exoneration from or Limitation of Liability, Plaintiff–Counter-Defendant–Appellant–Cross-Appellee,*

*v.*

UNITED STATES OF AMERICA, *Claimant–Counter-Claimant–Counter-Defendant– Appellee–Cross-Appellant,*

*[caption continued on inside cover]*

On Appeal from the U.S. District Court for the Southern District of New York, Hon. Paul A. Crotty S.D.N.Y. Case No. 18-cv-1359

**OPENING BRIEF OF APPELLANT/CROSS-APPELLEE ENERGETIC TANK, INC.**

Thomas H. Belknap, Jr.
Alan M. Weigel
BLANK ROME LLP
1271 Avenue of the Americas,
New York, NY 10020
(212) 885-5270
thomas.belknap@blankrome.com

David J. Weiner
Stephen K. Wirth
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
david.weiner@arnoldporter.com

UNKNOWN DEFENDANT,
*Defendant–Counter-Defendant–Appellee,*

NAVIN RAMDHUN,
*Defendant–Counter-Claimant–Appellee-Cross-Appellant,*

MARK JOSEPH LIGON, MALACHI SHANNON,
*Claimants–Counter-Claimants–Counter-Defendants–*
*Appellees–Cross-Appellants,*

JOSHUA BRUCE HOOK, MR. DOYLE A EBARB, JOSEPH K ROBBINS,
ANDY ACERET, GAO YONG, MICHAEL WUEST, JOSHUA PATAT,
ASHANTI MOLTON, DONNOVAN LAMARCUS JONES, AYAKA JOSEPH,
XIOMARO CUEVAS SOTO, DEVIN MASK, PATRICK JOSEPH, HARUKA RAMDHUN,
JASON LUANGCO, CHEYSSERR LUANGCO, NESTOR CUEVAS SOTO,
FRANCESCO SANFILIPPO, ALEXIS SANFILIPPO, CARMELO CASTRO,
PHILIP TORIO, PHILLIP FIELDS, JAMES ANDY WOODS, JOHN B. RAY,
RODRIGO OWEN TIONQUIAO, JERRELL DEAN, CLEMBER MIRANDA,
MICHAEL COLLINS, DEDRICK WALKER, MILTON O. LOVELACE,
DONNEL ROBINSON, DAVION REESE, MICHAEL WUEST, JOSHUA PATAT,
JUAN ROMERO, AKIMWALLE WINTER, VARES BELONY, TRACEY LOVELACE,
DELANDO BECKFORD, VICTOR GRANADOS, BYRON JAMAL JOHNSON,
*Counter-Claimants–Claimants–Appellees–Cross-Appellants,*

GILLEON GILLIS, JOHN HOAGLAND, KAREN DOYON, RICHARD LOPEZ,
TAYLOR TROY, KAREN BUSHELL, RACHEL ECKELS, THERESA PALMER,
DARRYL SMITH, AMY WINTERS, JACQUELINE INGRAM,
*Counter-Claimants–Claimants–Appellees,*

KERRINGTON HARVEY, JASON BALDWIN, MATTHEW MONTGOMERY,
BRANDON YORK,
*Claimants–Appellees–Cross-Appellants,*

JENNIFER SIMON, KAREN TOLLEY, *as personal representative*
*of the Estate of Brandon Tolley,*
*Claimants–Appellees,*

BRANDON TOLLEY,
*Claimant.*

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Petitioner-Appellant Energetic Tank, Inc., states that it does not have a corporate parent, and there is no publicly held corporation that owns 10% or more of its stock.

**TABLE OF CONTENTS**

Page

CORPORATE DISCLOSURE STATEMENT ........................................i

TABLE OF AUTHORITIES ...............................................iv

INTRODUCTION ........................................................1

STATEMENT OF JURISDICTION ..........................................7

STATEMENT OF THE ISSUES ............................................7

RELEVANT STATUTORY AND REGULATORY PROVISIONS ..............8

STATEMENT OF THE CASE..............................................10

    A.   Facts Established at Trial................................................11

    B.   Decisions Under Review ................................................23

        1.   Allocation.........................................................23

        2.   Contribution ......................................................28

STANDARD OF REVIEW ................................................29

SUMMARY OF ARGUMENT..............................................30

ARGUMENT ...........................................................33

I.   The District Court Erred in Allocating Fault to ALNIC...........................33

    A.   The district court failed to take into account the emergent circumstances and instead improperly relied on hindsight. ............33

        1.   Vessels in extremis must not be judged according to hindsight. ..................................................33

        2.   The district court's second-by-second scrutiny of ALNIC's conduct is the result of hindsight bias.........................................36

        3.   In nearly identical cases, courts attributed all fault to the overtaking vessel. ..........................................44

    B.   The district court erred in holding that ALNIC was "free to maneuver" when MCCAIN energized its red-over-red lights............48

        1.   The district court failed to find that MCCAIN de-energized its masthead lights.................................................50

2. It was not "apparent" that McCain was not "taking appropriate action" when it energized red-over-red..................52

C. The district court erred in finding that ALNIC failed to mitigate the damage to MCCAIN........................................56

1. There is no evidence that ALNIC could have mitigated damage by turning to port.................................56

2. There is no evidence that ALNIC could have mitigated damage after the collision.............................59

D. The district court improperly considered ALNIC's crew's post-collision conduct....................................61

II. The United States Has Waived Immunity to Petitioner's Counterclaim for Contribution.....................................63

A. The United States has expressly waived sovereign immunity with respect to counterclaims for any damages arising out of a collision with a public vessel.........................65

B. The *Feres* doctrine does not bar Petitioner's counterclaim. ............67

C. The Court should not extend *Feres* to counterclaims under the SIAA and PVA...............................................75

1. This Court is not obligated to extend *Feres*................................76

2. Supreme Court precedent bars the extension of *Feres* to cases where Congress has expressly waived immunity.............77

3. Extending *Feres* would be grossly unfair.................................78

4. Extending *Feres* would be inconsistent with longstanding precedent in maritime collision cases.............................80

5. Extending *Feres* would be inconsistent with equitable recoupment.........................................82

D. The United States' arguments are wrong. .........................................85

CONCLUSION............................................88

CERTIFICATE OF COMPLIANCE .................................................89

# TABLE OF AUTHORITIES

**Cases**                                                                 Page(s)

*Bugliotti v. Republic of Argentina,*
    952 F.3d 410 (2d Cir. 2020) ....................................................................87

*Canadian Aviator v. United States,*
    324 U.S. 215 (1945)......................................................................66, 82

*Complaint of American Export Lines, Inc.,*
    568 F. Supp. 956 (S.D.N.Y. 1983)...................................................83

*Dinnerstein v. United States,*
    486 F.2d 34 (2d Cir. 1973) ............................................................45

*Esso Standard Oil S. A. v. S.S. Gasbras Sul,*
    387 F.2d 573 (2d Cir. 1967) ....................29, 33, 34, 35, 42, 43, 44

*Farmers Mut. Ins. Co. v. Appalachian Power Co.,*
    78 F. App'x 259 (4th Cir. 2003)......................................................78

*Farrell Lines, Inc. v. S.S. Birkenstein,*
    207 F. Supp. 500 (S.D.N.Y. 1962)..................................................34

*Feres v. United States,*
    340 U.S. 135 (1950)..........................................................29, 67, 70

*The Fogo*
    [1967] 2 Lloyd's Rep 208 ..........................................................46, 47

*The Frosta*
    [1973] 2 Lloyd's Rep 348 ....................................44, 45, 46, 50, 59

*The Hercules,*
    73 F. 255 (2d Cir. 1896) ............................................................35, 44

*Herr v. U.S. Forest Serv.,*
    803 F.3d 809 (6th Cir. 2015)..........................................................77

*Hinkie v. United States,*
    715 F.2d 96 (3d Cir. 1983) .............................................................77

*Kirtz v. Trans Union LLC,*
  46 F.4th 159 (3d Cir. 2022)................................................66, 78

*Lanus v. United States,*
  570 U.S. 932 (2013)................................................................76

*M.P. Howlett, Inc. v. Tug Michael Moran,*
  425 F.2d 619 (2d Cir. 1970) ...........................................33, 34

*Mamiye Bros. v. Barber S.S. Lines, Inc.,*
  360 F.2d 774 (2d Cir. 1966) ...................................29, 34, 44

*The Mary T. Tracy,*
  298 F. 528 (S.D.N.Y. 1920)................................................34

*The Mary T. Tracy,*
  8 F.2d 591 (2d Cir. 1925) ..................................................35

*McDermott, Inc. v. AmClyde,*
  511 U.S. 202 (1994)......................................................78, 79

*The Mohegan,*
  28 F.2d 795 (2d Cir. 1928) ...........................................35, 41

*Nautical Challenge Ltd. v Evergreen Marine (UK) Ltd.*
  [2021] 1 WLR 1436 ...........................................................55

*NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, &*
  *Reinforcing Iron Workers, Local 229,*
  974 F.3d 1106 (9th Cir. 2020).........................................77

*Norwalk Cove Marina, Inc. v. S/V ODYSSEUS,*
  64 F. App'x 319 (2d Cir. 2003) ........................................84

*Olsen v. Luckenbach,*
  238 F. 237 (S.D.N.Y. 1916)......................................34, 35, 42

*Ortiz v. U.S. ex rel. Evans Army Cmty. Hosp.,*
  786 F.3d 817 (10th Cir. 2015)..........................................76

*Otal Invs. Ltd. v. M.V. Clary,*
  494 F.3d 40 (2d Cir. 2007) ..........................................61, 62

*The Otranto*
   [1931] A.C. 194 ..........................................................................48

*Peluso v. United States,*
   474 F.2d 605 (3d Cir. 1973) ........................................................77

*In re Potomac Transp., Inc.,*
   741 F. Supp. 394 (S.D.N.Y. 1989)..............................................52

*Ritchie v. United States,*
   733 F.3d 871 (9th Cir. 2013)................................................76, 77

*Scales v. United States,*
   685 F.2d 970 (5th Cir. 1982)........................................................76

*Sossamon v. Texas,*
   563 U.S. 277 (2011)......................................................................63

*Stencel Aero Engineering Corp. v. United States,*
   431 U.S. 666 (1977).................................................................67, 68

*Taber v. Maine,*
   67 F.3d 1029 (2d Cir. 1995) .......................................................76

*The Roanoke*
   [1908] P 231 ................................................................................48

*The Thekla,*
   266 U.S. 328 (1924).....................................................................81

*The Tian E Zuo*
   [2019] 4 SLR 475............................................35, 36, 37, 43, 44

*U.S. Fire Ins. Co. v. United States,*
   806 F.2d 1529 (11th Cir. 1986)...................................................66

*United States v. Forma,*
   42 F.3d 759 (2d Cir. 1994) .............................................29, 83, 84

*United States v. Idaho ex rel. Director, Idaho Dept. of Water Res.,*
   508 U.S. 1 (1993)...........................................................63, 67, 78

*United States v. Johnson,*
481 U.S. 681 (1987) .................................................................76

*United States v. Nat'l City Bank of N.Y.,*
83 F.2d 236 (2d Cir. 1936) ....................................................81

*United States v. Shearer,*
473 U.S. 52 (1985) .................................................................69

*United States v. Wessel, Duval & Co.,*
115 F. Supp. 678 (S.D.N.Y. 1953) ...............................83, 84

*United States v. Yellow Cab Co.,*
340 U.S. 543 (1951) .................................................................66

*Uralde v. United States,*
614 F.3d 1282 (11th Cir. 2010) ...........................................66

*Veillette v. United States,*
615 F.2d 505 (9th Cir. 1980) ...............................................76

*Vulcan Materials Co. v. Massiah,*
645 F.3d 249 (4th Cir. 2011) ..............................73, 74, 75

*In re Vulcan,*
647 F. Supp. 2d 756 (E.D. Va. 2009) ...............................74

*The Western Maid,*
257 U.S. 419 (1922) ...................................................80, 81, 82

*Wills v. Amerada Hess Corp.,*
379 F.3d 32 (2d Cir. 2004) ...........................................58, 60

**Federal Statutes**

33 U.S.C. § 1602 ...........................................................................9

46 U.S.C.
§ 30903(a) ...............................................................................65
§ 31102(b) ...............................................................................65
§ 30903(a) ...............................................................................63
§ 31102(b) ..........................................63, 65, 67, 68, 79, 84

Public Vessels Act, Pub. L. No. 109-304, § 6(c), 120 Stat. 1521
(2006) (codified at 46 U.S.C. § 31102) .......................5, 8, 63, 65, 67, 68, 79, 84

Suits in Admiralty Act, Pub. L. No. 109-304, § 6(c), 120 Stat. 1518
(2006) (codified at 46 U.S.C. § 30903) .......................5, 8, 63, 65, 67, 68, 79, 84

**International Treaties & Statutes**

International Regulations for Preventing Collisions at Sea
(COLREGS), 28 U.S.T. 3459, TIAS No. 8587, 1050 U.N.T.S. 16
    Rule 6 .................................................................................24
    Rule 8 .................................................................................24
    Rule 8(b) ............................................................................25
    Rule 8(d) ............................................................................25
    Rule 8(e) ............................................................................55
    Rule 13(a) ...............................................................24, 48, 49
    Rule 16 ...............................................................................25
    Rule 17 .................................................................9, 26, 27, 52
    Rule 17(a)(i) .........................................................27, 48, 52, 56
    Rule 17(a)(ii) ...................................................27, 49, 50, 51, 52, 54
    Rule 17(b) ......................................................................27, 56
    Rule 18(a)(i) .......................................................................49
    Rule 20(b) ..........................................................................50
    Rule 27(a) ..........................................................................50

Singapore Maritime Conventions Act 1911
    § 3(1) ...........................................................................85, 86
    § 3(2) ...........................................................................85, 86

Singapore State Immunity Act 1979
    § 4(3) ................................................................................86
    § 7(a) ................................................................................85

**Legislative Materials**

H.R. Rep. No. 913 (1925) ...............................................................73, 82

S. Rep. No. 941 (1925) ..................................................................73, 82

**Treatises**

Allen & Allen, *Farwell's Rules of the Nautical Road* 57 (9th ed. 2020)..........49

2 Am. Jur. 2d Admiralty § 44.......................................................................80

Marsden & Gault, *Collisions at Sea* ¶ 5-155 (14th ed. 2006)...........................49

**INTRODUCTION**

Hours before sunrise on a moonless morning, the U.S.S. JOHN S. MCCAIN, a U.S. Navy guided-missile destroyer, entered the Singapore Straits—one of the world's busiest shipping lanes—at twice the speed of surrounding vessels and with a commander and bridge crew that lacked even a basic understanding about how to operate their vessel. Incredibly, they did not understand the vessel's electronic controls and, at critical junctures, they did not even know who on the bridge was in control of the warship. The results were catastrophic.

Operating under the mistaken belief that the vessel's steering was not functioning, the crew repeatedly traded control over steering five times in barely more than a minute until they inadvertently turned MCCAIN directly into the path of a larger, much slower, and less maneuverable tanker, the M/V ALNIC MC. Despite an attempt by ALNIC's crew to slow down, its efforts came too late. The two vessels collided. Tragically, ten sailors died and others were injured. Both vessels suffered considerable damage, and the Navy ultimately court-martialed several of MCCAIN's crew, including the warship's commanding officer.

MCCAIN's negligence had a long tail. It started with the Navy's decision to replace MCCAIN's traditional controls with a new, ostensibly state-of-the-art electronic control interface known as the Integrated Bridge and Navigation System (IBNS). But the IBNS was buggy, regularly crashed, and the Navy failed for over a year to fix these problems. On top of that, the Navy never properly trained MCCAIN's crew to operate the IBNS and instead expected them to learn this new system on their own—an impossible task.

These failures were compounded by several fateful decisions made by MCCAIN's commanding officer, which he admitted to in a stipulated plea agreement. Among other things, he improperly delayed staffing the bridge with more experienced personnel and then made an on-the-fly decision to delegate steering to an inexperienced and untrained crewmember. Because they did not understand the IBNS, the crew bungled the transfer of steering, which caused them to mistakenly believe that they had lost steering altogether. The vessel's steering was actually fully operational, but in the chaotic minutes it took the Navy crew to troubleshoot the non-existent fault, they steered the speeding warship sharply into ALNIC's path.

The district court properly recognized that MCCAIN's negligence—its unsafe speed, untrained crew, and understaffed bridge, together with nu-

merous critical errors in judgment—was overwhelmingly responsible for the collision. But the district court concluded that ALNIC was also negligent, 20% responsible for the collision, and owed the United States nearly $45,000,000 for damage to MCCAIN. That decision reflected multiple legal errors and must be vacated.

Foremost among its errors, the district court failed to apply a long-established principle that the actions of a vessel's crew who are forced to respond to an emergency must not be judged in the harsh glare of hindsight. That is precisely what the district court did here. It parsed ALNIC's crew's conduct on a second-by-second basis. It then found ALNIC's crew negligent because they failed to undertake extreme evasive maneuvers in the 50-second window between a sharp turn by MCCAIN and the collision. The United States' expert deemed these maneuvers proper only after he repeatedly reviewed radar replay of the collision and then practiced the maneuvers dozens of times in a simulator. But ALNIC's crew had no way to know that a collision was certain to occur, much less precisely where and when (down to the second); they certainly did not have the luxury of practicing how to avoid MCCAIN's erratic actions in a sterile and controlled simulator environment. The district court's conclusion that ALNIC's crew was negligent—among oth-

er things, because they did not undertake maneuvers identified by the United States' expert after the fact—is reviewed *de novo*, is directly contrary to the outcome in cases involving nearly identical facts, and must be vacated.

The district court made several additional legal errors. Notably, it misinterpreted several of the COLREGS, the so-called maritime rules of the road that were created to prevent collisions, including their codification of a foundational maritime principle that an overtaking vessel (or "give-way vessel") *must* do so safely while a vessel being overtaken (or "stand-on vessel") *must* keep her course and speed. Paradoxically, the district court's misapplication of the COLREGS threatens maritime safety by creating an obligation for stand-on vessels to act *before* they could possibly tell that an overtaking vessel is out of control. And the district court compounded these legal errors by making several findings about ALNIC's ability to mitigate the collision that are contradicted by evidence in the record.

Putting aside the district court's erroneous allocation of fault, the district court also erred when it decided that the United States was immune to a counterclaim for contribution, setoff, or indemnity brought by ALNIC's owner (Petitioner Energetic Tank, Inc.) for damages to McCain's sailors. The district court justified this decision based on an unprecedented extension of the

*Feres* doctrine—which prohibits service members from suing the United States for service-related injuries under the Federal Tort Claims Act—that required it to brush past the plain language of two federal statutes. The district court thus excused the United States from any responsibility for its share of liability for damages that ALNIC pays to MCCAIN's sailors, even though the United States was found to be overwhelmingly responsible for the collision and despite receiving an award of tens of millions of dollars on its own damages claim against the ALNIC's owner.

The decision on contribution is not only highly inequitable, it also ignores the plain language of the Suits in Admiralty Act (SIAA) and Public Vessels Act (PVA), which expressly waive sovereign immunity for *counterclaims* against the United States. These statutes reflect a longstanding admiralty rule that sovereign immunity does not bar counterclaims when the United States asserts affirmative damages claims, as it did here. In fact, even following enactment of the SIAA and PVA, federal courts have continued to hold that sovereign immunity is categorically inapplicable when a party seeks to recoup losses from the United States after it affirmatively seeks damages.

The district court, however, dismissed ALNIC's contribution counterclaim based almost entirely on its—frankly, implausible—conclusion that it

would interfere with military discipline and readiness. But there is no precedent that required the district court to extend *Feres* to this case. Neither *Feres* nor any judicial decision applying *Feres* involved a contribution *counterclaim* asserted in response to an affirmative damages claim by the United States. And, on first principles, the district court's reasoning makes no sense. The United States *itself* called MCCAIN's commanding officer and crew as witnesses in service of its claim against ALNIC and award of $44,857,901 in damages. Having decided to prosecute its own claim in this manner (and having prevailed in part), the United States can't plausibly assert that allowing ALNIC's contribution counterclaim—which will require no additional testimony from MCCAIN's officers and crew and which will entail only a straightforward application of the district court's apportionment of liability—will in any way harm military discipline and readiness. The practical realities of this case therefore align perfectly with the express waiver of sovereign immunity Congress enacted for cases just like this one. The SIAA and PVA should be applied as written, and the district court's dismissal of ALNIC's contribution claim reversed.

## STATEMENT OF JURISDICTION

The district court exercised jurisdiction under 28 U.S.C. § 1333.

On June 15, 2022, the district court denied Petitioner-Appellant Energetic Tank, Inc.'s petition for limitation of liability and exoneration, and apportioned liability. SPA-1-70. Petitioner timely appealed on August 12. A-3209. On October 6, the district court entered an order correcting the calculation of damages and certifying final judgment. SPA-71-76.

On October 12, the district court dismissed Petitioner's counterclaim for contribution. SPA-77-87. Petitioner timely appealed on October 21. A-3218.

This Court has jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.  Whether the district court erred in allocating ALNIC any fault for the collision.

2.  Whether the United States waived sovereign immunity to Petitioner's counterclaim for contribution, setoff, and indemnity.

# RELEVANT STATUTORY AND REGULATORY PROVISIONS

The Suits in Admiralty Act (SIAA), Pub. L. No. 109-304, § 6(c), 120 Stat. 1518 (2006) (codified at 46 U.S.C. § 30903), provides in relevant part:

### § 30903. Waiver of immunity

(a) IN GENERAL.—In a case in which, if a vessel were privately owned or operated, or if cargo were privately owned or possessed, or if a private person or property were involved, a civil action in admiralty could be maintained, a civil action in admiralty in personam may be brought against the United States or a federally-owned corporation. In a civil action in admiralty brought by the United States or a federally-owned corporation, an admiralty claim in personam may be filed or a setoff claimed against the United States or corporation.

The Public Vessels Act (PVA), Pub. L. No. 109-304, § 6(c), 120 Stat. 1521 (2006) (codified at 46 U.S.C. § 31102), provides in relevant part:

### § 31102. Waiver of immunity

(a) IN GENERAL.—A civil action in personam in admiralty may be brought, or an impleader filed, against the United States for—

(1) damages caused by a public vessel of the United States;

(2) compensation for towage and salvage services, including contract salvage, rendered to a public vessel of the United States.

(b) COUNTERCLAIM OR SETOFF.—If the United States brings a civil action in admiralty for damages caused by a privately owned vessel, the owner of the vessel, or the successor in interest, may file a counterclaim in personam, or claim a setoff, against the United States for damages arising out of the same subject matter.

Rule 17 of the International Regulations for Preventing Collisions at Sea (COLREGS), 28 U.S.T. 3459, TIAS No. 8587, 1050 U.N.T.S. 16,[1] provides, in relevant part:

**RULE 17**
**Action by Stand-on Vessel**

(a)

(i) Where one of two vessels is to keep out of the way, the other shall keep her course and speed.

(ii) The latter vessel may, however, take action to avoid collision by her maneuver alone, as soon as it becomes apparent to her that the vessel required to keep out of the way is not taking appropriate action in compliance with these Rules.

(b) When, from any cause, the vessel required to keep her course and speed finds herself so close that collision cannot be avoided by the action of the give-way vessel alone, she shall take such action as will best aid to avoid collision.

…

(d) This Rule does not relieve the give-way vessel of her obligation to keep out of the way.

---

[1] The COLREGS entered into force in the United States by presidential proclamation, 28 U.S.T. 3459, as authorized by Congress, 33 U.S.C. § 1602, and in Singapore pursuant to the Merchant Shipping (Prevention of Collisions at Sea) Regulations § 3. The current COLREGS, as published by the U.S. Coast Guard, were entered into evidence as Trial Ex. 591C, which is reproduced in the Special Appendix at SPA-88-159.

## STATEMENT OF THE CASE

This appeal arises out of the collision between U.S.S. JOHN S. MCCAIN and M/V ALNIC MC, which occurred in the Singapore Strait in August 2017.

Petitioner Energetic Tank (ALNIC's owner) filed a limitation action in federal district court. A-219-225. Forty-two claims were filed against Petitioner. All but one of the claimants are Navy sailors or their representatives (the "Sailor-Claimants"). DE 38-1.[2] The remaining claimant is the United States, which filed a claim for damages to MCCAIN. A-305-319. Petitioner counterclaimed against the United States, seeking to recover for damages to ALNIC and seeking contribution, setoff, and indemnity for claims brought by the Sailor-Claimants. A-320-331.

The district court conducted a bench trial to apportion liability and damages for the collision between Petitioner and the United States, while holding the Sailor-Claimants' claims for trial at a later date. Applying Singapore law, the court determined that the United States was 80% at fault for the collision and Petitioner was 20% at fault. SPA-1-70. In a separate opinion, the court dismissed Petitioner's counterclaim on the basis of sovereign im-

---

[2]    Citations to docket entries below appear as "DE [number]."

munity. SPA-77-87. The court entered final judgment in favor of the United States totaling $44,857,901. SPA-71-76.

## A.  Facts Established at Trial

**1.** The U.S.S. JOHN S. MCCAIN is a U.S. Navy Arleigh Burke–class guided-missile destroyer. SPA-3. MCCAIN is a fast and highly maneuverable warship, especially compared to non-military vessels. *Id.* MCCAIN is powered by four gas turbine engines that drive two propellers. *Id.* MCCAIN's steering and thrust is controlled through an Integrated Bridge and Navigation System (IBNS), a new computerized system. SPA-3-4, 11. Additionally, MCCAIN has traditional steering wheels that are found on certain of the IBNS consoles, but it lacked the traditional throttle levers found on most vessels used to control thrust. *Id.*

With multiple IBNS consoles, MCCAIN can be controlled from several locations, including at the helm and lee helm stations on the bridge and in the aft steering station, which is in the vessel's stern. The IBNS touchscreens at each station are identical. DE 371, Proposed Findings of Fact (FOF) ¶ 21. Typically, the helmsman controls both steering and thrust but another crew

member, the lee helmsman, can be added to assist with either function. Tr. 202:3-204:9.[3]

An IBNS console "looks nothing like a traditional steering console," with a touchscreen containing "extensive functions, drop down menus, and hosts of configurations." SPA-4. From each IBNS touchscreen, an operator could take control of the ship's steering or thrust, or transfer control to another station. *Id.* Once in control, the operator could, among many other things, precisely control the pitch and thrust of the individual propellers and the angle of the rudders. *Id.* The IBNS touchscreens also had buttons to "gang" the propellers (linking them together) or "un-gang" them (allowing the operator to mismatch the thrust and thereby turn MCCAIN quickly). *Id.* There was also an "All Stop" button, which, if pressed, would stop the engines and all propeller thrust immediately, regardless of whether the propellers were ganged or un-ganged. *Id.* And both the bridge and the aft steering station had a physical "Emergency Override to Manual" button—known as the "Big Red Button"—which, if pressed, would immediately take control of steering from any other station on MCCAIN. *Id.*

---

[3] Citations to the trial transcript (found at A-1417-2188) appear as "Tr. [page]:[line]."

MCCAIN's IBNS was not only new and technologically complicated; it was also prone to critical failure. At the time of the collision, MCCAIN had unaddressed casualty reports concerning major IBNS system crashes—some of them still outstanding since the new technology's installation a year earlier. SPA-11. Just weeks before the collision, MCCAIN's commanding officer, Commander Alfredo Sanchez, sent an email to Navy technicians, expressing frustration that the IBNS was "unstable, albeit safe to navigate, and the multiple cascading node crashes are a distraction to the safe operation of the Ship." *Id.* A Navy technician was due in Singapore to help repair the IBNS as soon as the warship arrived. *Id.*

In the meantime, Commander Sanchez's preferred "work around" for IBNS glitches was to switch the destroyer to "backup manual" mode—a system setting which, according to the district court, "affected steering control in ways that neither he nor his crew understood." *Id.* Backup manual mode allowed the helmsman to steer the rudders using only the ship's physical steering wheel, without any assistance by the IBNS, thus avoiding some of its faults. *Id.* At the time, however, the crew had not received proper training on the IBNS and did not understand the full impact of using backup manual mode on the IBNS's many functions. *Id.*

**2.** In the early hours of the morning of August 21, 2017, MCCAIN and ALNIC were both heading west in the Singapore Strait, bound for Singapore. SPA-21. The pre-dawn sky was moonless and dark, and many other ships were navigating the strait's crowded Traffic Separation Scheme, which is essentially a maritime highway with various lanes for different ships. *Id.* ALNIC, a massive, fuel-laden tanker, was the slowest in a group of several commercial vessels bunched close together. One ship, TEAM OSLO, had just overtaken ALNIC; and two others, HYUNDAI GLOBAL and GUANG ZHOU WAN, were in the middle of overtaking ALNIC on either side. SPA-22. MCCAIN approached this group of vessels on ALNIC's starboard side. *Id.* As the overtaking vessel, MCCAIN had a duty under the COLREGS to steer clear of other vessels, whereas the vessels being overtaken (including ALNIC) had a duty to maintain their course and speed. SPA-48, 55.

Notwithstanding the crowded shipping lane and pitch-black conditions, Commander Sanchez ordered MCCAIN to enter the strait short staffed. Against his officers' recommendation, he had decided not to schedule "Sea and Anchor Detail," a staffing detail that would have included additional specialized and more-experienced navigation personnel, until 0600 hours, well after MCCAIN had entered the strait. SPA-8-9. MCCAIN was also traveling

fast, much faster than surrounding vessels, and over twice as fast as ALNIC. SPA-21-22. And the destroyer was operating in backup manual mode, with the helmsman steering the destroyer manually. SPA-11. Unlike the nearby vessels, Commander Sanchez opted not to engage the MCCAIN's Automatic Identification System (AIS) to transmit to surrounding vessels critical navigational data including the warship's position, course, speed, and navigational status. SPA-50-51.

MCCAIN and ALNIC collided just before 0524 hours, local time, on the morning of August 21, 2017. At approximately 05:20:30 (3'28" to collision), Commander Sanchez ordered MCCAIN's thrust control to be transferred from the helm to the lee helm because Commander Sanchez believed the helmsman was "reaching … task saturation." SPA-24. This decision to split steering and thrust control was not planned or briefed in advance. DE 371, FOF ¶ 202. And this was the first time the lee helmsman had stood watch in that position *ever*. SPA-47.

MCCAIN's crew attempted to carry out Commander Sanchez's order, but they made two critical errors. First, the propellers were un-ganged, and the crew transferred control of only the *portside* propeller to the lee helmsman. SPA-24. Second, they also inadvertently transferred *steering* from the

helm to the lee helm without warning to, or acceptance by, the helmsman (possible only because the ship was operating in backup manual mode). DE 371, FOF ¶¶ 208-11. No one noticed either error.

Following the botched transfer, at approximately 05:21:00 (less than 3' to collision), the helmsman announced a "loss of steering" to the bridge, unaware that steering had been transferred to the lee helm. SPA-24-25. But the lee helmsman didn't even check to see if his station had steering control, because, in his own words, "no one knew the lee helm could steer." SPA-25.

Over the next several minutes, MCCAIN's crew didn't know which station had control of steering. At 5:21:23 (2'35" to collision), MCCAIN announced to its crew over the ship's PA system: "Loss of steering in the pilot house, loss of steering in the pilot house. Man aft steering." *Id.* But operators at different stations were repeatedly pressing the Big Red Button—thereby taking steering control *away* from other stations—under the mistaken belief that the button would *send* control to aft steering. *Id.* As described by the district court, "control of steering ping-ponged around the ship, with none of the crew understanding where it was at any given time, or how to get it back." *Id.*

At approximately 05:21:25 (2'33" to collision), McCain energized its "red-over-red" lights to indicate to other vessels that the warship was "not under command." SPA-25-26. To properly signal "not under command" a vessel must take two actions: turn on the "red-over-red" lights and also turn off (or "de-energize") the white masthead lights. SPA-7. There is no evidence, and the district court did not find, that MCCAIN de-energized the masthead lights. In fact, the evidence demonstrated that MCCAIN *never* de-energized them. *See* DE 371, FOF ¶¶ 231-35.

The ALNIC's crew were tracking MCCAIN's course on radar but had no way to know about the chaos unfolding aboard the warship. At 05:21:54 (2'04" to collision), ALNIC's master, Ritchie Nolasco, started tracking MCCAIN's course using automatic radar plotting aids (ARPA). SPA-28.[4] This ARPA calculation uses information from ALNIC's radar systems and takes 50 seconds to complete. *Id.* At this point, it was not apparent that MCCAIN posed any threat; while the warship's course had begun drifting slightly port, it remained relatively on course. SPA-24, 28.

---

[4] ALNIC's voyage data recorder recorded data from the vessel's various instruments, including images taken from ALNIC's radar at 15-second intervals. DE 371, FOF ¶ 303.

At approximately 05:22:06 (1'52" to collision), Commander Sanchez ordered MCCAIN's speed reduced from 20 knots to roughly 10 knots. SPA-29. The lee helmsman reduced the thrust on the IBNS touchscreen, but because he didn't realize the propellers remained un-ganged, he reduced thrust to only the *portside* propeller. *Id.* This error caused MCCAIN to begin turning to port, toward ALNIC. *Id.* But it was still not apparent to surrounding ships that MCCAIN was off course. As late as 05:22:31 (1'27" to collision), "MCCAIN's course had only shifted about 22 degrees towards ALNIC." SPA-39. "At that moment," the district court found, "reasonable mariners could have disagreed whether MCCAIN would collide with ALNIC." *Id.*

At 5:22:43 (1'15" to collision), ALNIC completed its 50-second ARPA calculation, triggering a "collision alarm" to sound. SPA-29. This alarm is triggered when a tracked vessel comes within a specified range of another vessel's "closest point of approach"; it does not indicate that the ARPA has calculated a collision course. DE 371, FOF ¶ 284; DE 372 at 32. ALNIC's alarm was set to sound if the ARPA calculated a vessel's "closest point of approach" to be within 0.5 nautical miles, so it sounded when it calculated MCCAIN's closest point of approach to be 0.27 nautical miles. *Id.* Up until the moment of

the collision itself, the ARPA never calculated a closest point of approach of 0.0 miles. *Id.* In other words, it never predicted a collision.

Because Commander Sanchez had chosen *not* to broadcast AIS data, ALNIC had no direct information regarding MCCAIN's navigational status. The district court found this data to be "crucial" and that it "would have helped ALNIC confirm that MCCAIN had lost control of steering and better predict the destroyer's trajectory." SPA-50. The court further found that "Navy guidelines required the destroyer to broadcast AIS data for safety" and that "MCCAIN's decision not to take this prudent step was reflective of her larger failure to exhaust every option to avoid colliding with ALNIC." *Id.* At no time did MCCAIN attempt to signal danger with its whistle or attempt to hail ALNIC via radio. SPA-34.

At 05:22:45 (1'13" to collision), Commander Sanchez ordered MCCAIN to slow again, to 5 knots. SPA-30-31. But because the thrust was *still* unganged, the lee helmsman again reduced thrust to only the portside propeller, leading to an even greater thrust mismatch and causing MCCAIN to veer *even harder* towards ALNIC. SPA-31.

At this point, microphones on ALNIC's bridge recorded statements evincing confusion about what MCCAIN was doing. Master Nolasco initially

remarked that McCain appeared to be trying to pass between ALNIC and TEAM OSLO, which had recently overtaken ALNIC. SPA-31. At first, he believed that the warship's course was "OK," but upon reflection—and with *only 41 seconds* until the collision—he stated that he believed McCAIN was doing the "wrong maneuver." *Id.*

Back on McCAIN, the crew in aft steering finally secured control of the warship's steering at 05:23:27 (31" to collision). SPA-33. But the aft crew didn't realize the rudders still had a "hard left" order on the IBNS touchscreen, so McCAIN veered *even harder* towards ALNIC before the rudders reset. *Id.* At 05:23:44 (14" to collision), McCAIN finally began turning to starboard, away from ALNIC. *Id.*

At the same time, Master Nolasco decreased ALNIC's speed, from full ahead to half ahead, but there was not enough time, or ocean, to slow the massive tanker to avoid a collision. SPA-33-34. Weighing 39,000 metric tons, ALNIC "took around 7 minutes—and 1.35 nautical miles—to go from full speed ahead to full stop." SPA-12. Even had Master Nolasco ordered "crash astern," throwing ALNIC's engines into full reverse, it would have taken nearly as long to begin slowing the vessel. *Id.*; DE 371, FOF ¶¶ 53-60. The McCAIN, in contrast, was the maritime equivalent of a sportscar and could

20

stop quickly; but at no point in time did MCCAIN's crew hit the "All Stop" button. SPA-50.

The ships collided at 05:23:58. SPA-34-35. ALNIC's V-shaped bulbous bow crashed into MCCAIN's port side, piercing the warship's hull and embedding into several crew compartments. *Id.* At 5:24:40 (42″ after collision), Master Nolasco gave the "all stop" order, and 20 seconds later, he ordered ALNIC's autopilot turned off. SPA-36. The resulting damage to both ships was extensive. Tragically, ten Navy sailors were killed, and others were injured. SPA-35.

**3.** Following an extensive investigation, the Navy released a public report, which identified three principle faults aboard MCCAIN:

- "Loss of situational awareness in response to mistakes in the operation of [MCCAIN's] steering and propulsion system, while in the presence of a high density of maritime traffic."

- "Failure to follow the International Nautical Rules of the Road [COLREGS], a system of rules to govern the maneuvering of vessels when risk of collision is present."

- "Watchstanders operating [MCCAIN's] steering and propulsion systems had insufficient proficiency and knowledge of the systems."

SPA-42.

The Navy also found that MCCAIN's bridge crew "lacked a basic level of knowledge on the steering control system, in particular the transfer of

steering and control between stations," SPA-9, and that crewmembers responsible for training and certifying watchstanders "had an insufficient level of knowledge to effectively maintain appropriate rigor in the qualification program." DE 371, FOF ¶ 104. The Navy also determined that "[i]f the [commanding officer] had set Sea and Anchor Detail adequately in advance of entering the Singapore Strait Traffic Separation Scheme, then it is unlikely that a collision would have occurred." *Id.* ¶ 174. Ultimately, the Navy concluded that the many failures aboard MCCAIN were systemic:

> Many of the decisions made that led to this incident were the result of poor judgment and decision making of the Commanding Officer. That said, no single person bears full responsibility for this incident. The crew was unprepared for the situation in which they found themselves through a lack of preparation, ineffective command and control and deficiencies in training and preparations for navigation.

SPA-51. The United States likewise stipulated as part of the ensuing court-martial proceedings that "[t]here was never a steering casualty" suffered by MCCAIN but rather "a loss of situational awareness concerning which station was in control of steering primarily due to a lack of knowledge of the proper operation of the [IBNS] SCC." DE 372 at 15-16.

The Navy ultimately disciplined *twenty* members of MCCAIN's crew. Commander Sanchez was court-martialed, pleaded guilty to dereliction of

duty, and agreed to retire from the Navy. SPA-42. Other senior-ranking officers were disciplined for failing to ensure proper training of the crew. *Id.* And both the helmsman and lee helmsman were found to have been derelict in their duties. *Id.*

## B. Decisions Under Review

### 1. *Allocation*

Following a bench trial, the district court issued a decision allocating 80% of fault for the collision to the United States and 20% to Petitioner, and declining to limit Petitioner's liability under the Limitation of Liability Act of 1851, ch. 43, 9 Stat. 635 (codified as amended at 46 U.S.C. §§ 30501-12). SPA-1-70.

**a.** The district court determined that Singapore law applied. SPA-42-43; DE 247; DE 267. Singapore, like the United States, has adopted the International Regulations for Preventing Collisions at Sea, known as the COLREGS. SPA-44; *see* SPA-88-159 (Trial Ex. 591C). The COLREGS are "a series of navigational 'rules of the road' designed to help vessels avoid collisions by acting predictably." SPA-43-44. Under Singapore law, a breach of the COLREGS "does not create negligence liability per se"; rather, "a vessel

is only liable for a violation of the COLREGS if that violation *caused* the collision." SPA-44.

**b.** The district court determined that a series of specific errors in judgment and decisionmaking, combined with widespread systemic failures, rendered MCCAIN overwhelmingly at fault for the collision.

The district court found that MCCAIN violated several of the COLREGS, causing the collision. *First*, COLREGS Rules 8 and 13(a) required MCCAIN to keep clear of ALNIC and, as the overtaking vessel, to pass at a safe distance. MCCAIN violated those provisions "[b]y turning directly into the tanker's path without warning." SPA-48.

*Second*, COLREGS Rule 6 requires vessels to proceed at a safe speed. MCCAIN violated that requirement "by deciding not to stop outright after they had lost control of steering." *Id.* The district court found that MCCAIN could have "easily avoided a collision" had crew simply pressed "the All Stop button, which was available in plain sight on the IBNS touchscreen." SPA-50. "MCCAIN's ability to stop, although not instantaneous, was quite impressive, as she boasted reversible propellers that Commander Sanchez likened to 'opening two parachutes' behind the destroyer." *Id.*

*Third*, COLREGS Rules 8(d) and 16 require vessels to "keep well clear" of other vessels. The district court held that MCCAIN violated those provisions when it "veered suddenly off-course" into ALNIC's lane. SPA-49.

*Fourth*, COLREGS Rule 8(b) provides that "a succession of small alterations of course and/or speed should be avoided" so that nearby vessels can predict the vessel's course. MCCAIN violated this provision when the lee helmsman successively reduced thrust to the portside propeller without realizing that the throttles were un-ganged. *Id.* The district court concluded that "the improper use of steering and thrust was entirely preventable, violated the COLREGS, and was the primary cause of the collision." SPA-50.

The district court also found that MCCAIN's "longstanding" failure to properly train its "crew sparked the confusion on her bridge and fueled the mistakes leading up to the collision." SPA-46. "That even senior officers failed to have (let alone implement) proper understanding of the IBNS, steering, and thrust procedures enhances MCCAIN's culpability and was a proximate cause of the collision." *Id.* Those errors were compounded by "persistent IBNS technical snafus (long unaddressed by Navy leadership)," which "forced MCCAIN's crew to repurpose a system setting"—backup manual mode—that "they did not understand." SPA-47. Beyond that, the district

court faulted "Commander Sanchez's failure to set 'Sea and Anchor' Detail before entering the Singapore Strait." *Id.* The court concluded that the on-duty crew's "lack of experience contributed to the thrust mismatch, the failure to press the All Stop button, and the inability to recover steering or thrust control by attributing to external forces problems that MCCAIN's crew could have easily resolved *at any time* prior to the collision." *Id.*

**c.** Notwithstanding the overwhelming fault assigned to MCCAIN, the district court determined that ALNIC was 20% liable for the collision. *First*, the court held that ALNIC had failed to properly staff the bridge. SPA-51-54. The court found that "ALNIC's Safety Management System required five crewmembers on the bridge while in the Singapore Strait, including both an anti-collision officer and a dedicated lookout." SPA-52. The district court acknowledged, however, that one crewmember "had been given some lookout duties on the morning of the collision"; indeed, "he was heard … stating he had seen MCCAIN from the bridge." *Id.*

*Second*, the district court held that ALNIC violated COLREGS Rule 17 by failing to slow or turn away from McCain. Rule 17 codifies a longstanding, fundamental maritime rule that, with only limited exceptions, a vessel being over taken *must* maintain its course and speed to ensure predictability for

other vessels. Rule 17 thus provides a three-tier framework describing the responsibilities of a stand-on vessel and when it *may not*, *may*, or *must* deviate from its course to avoid a collision with an overtaking vessel. Per the district court:

> ALNIC had a baseline duty under Rule 17(a)(i) to maintain course and speed as MCCAIN passed by. That way, ALNIC would remain predictable to vessels attempting to maneuver around it. But Rule 17(a)(ii) gave ALNIC latitude to maneuver once it became apparent that MCCAIN was "not taking appropriate action" under the COLREGS—for instance, by heading towards ALNIC at close quarters. And finally, once ALNIC found "herself so close that collision" could not be avoided by MCCAIN alone, Rule 17(b) required ALNIC to "take such action as will best aid to avoid collision."

SPA-55.

The court held that ALNIC was "free"—but not obligated—"to maneuver" under Rule 17(a)(ii) once MCCAIN's red-over-red lights were energized. SPA-56. The court further held that ALNIC was obligated to act under Rule 17(b) once Master Nolasco stated his belief that MCCAIN was doing the "wrong maneuver," and faulted Master Nolasco for taking 27 seconds to slow ALNIC's engines. SPA-58. The court further stated that "[a] combination of slowing and turning the tanker would have meaningfully mitigated the collision by reducing the force of impact and avoiding a T-bone." *Id.*

*Third*, the district court held that "ALNIC's most inexcusable fault … was her failure to do anything to mitigate the damage after colliding with McCAIN." SPA-59. The court found that "ALNIC negligently left her engine[] running for 42 seconds after the collision and left her autopilot on for over a minute." *Id.* The court further found that, "[c]ombined with the engine propulsion, … the autopilot steering caused ALNIC to sweep her bow over 45 degrees through McCAIN's Berthing 3 and 5 for over a minute." *Id.* The court concluded that "[t]his additional contact between the vessels increased the damage to McCAIN and the potential loss of life in the berthing areas." *Id.*

*Finally*, the district court noted that ALNIC's crew had falsified logs after the collision. The court acknowledged that "the creation of false logs had no causative effect on a collision that had already taken place," and that "Petitioner has long since admitted the falsities, lessening their poisonous effect on the evidence presented at trial (much of which was undisputed)." SPA-60. But the court nonetheless held that "the crew's subsequent coverup confirms the apportionment of ALNIC's fault." *Id.*

### 2. Contribution

In a separate decision, the district court dismissed Petitioner's counterclaim for contribution, setoff, and indemnity related to the Sailor-

Claimants' claims under *Feres v. United States*, 340 U.S. 135 (1950). SPA-77-87. Despite acknowledging that the SIAA and PVA waive the United States' immunity to counterclaims, the court held that that *Feres* creates an exception with respect to contribution counterclaims involving service-related injuries. SPA-83-87. The district court, however, didn't identify a single case applying *Feres* where, as here, the United States had first invoked the district court's jurisdiction by filing an affirmative claim and was awarded damages against the private shipowner. The district court also didn't address Petitioner's unrebutted arguments that it was entitled to contribution under Singapore law.

**STANDARD OF REVIEW**

This Court reviews findings of fact for clear error. *Mamiye Bros. v. Barber S.S. Lines, Inc.*, 360 F.2d 774, 776 (2d Cir. 1966) (Friendly, J.). But "[w]hether the facts constitute negligence is … a question of law," which the Court reviews *de novo*. *Esso Standard Oil S. A. v. S.S. Gasbras Sul*, 387 F.2d 573 (2d Cir. 1967); *see Mamiye Bros.*, 360 F.2d at 776. The Court likewise reviews a dismissal for lack of subject-matter jurisdiction *de novo*. *United States v. Forma*, 42 F.3d 759, 762 (2d Cir. 1994).

**SUMMARY OF ARGUMENT**

**I.A.** The district court ignored the First Commandment of collision cases: that a vessel's captain and crew must be judged in light of the dangerous conditions they faced, with all their risks and uncertainties, and not according to hindsight. The district court's second-by-second scrutiny of Alnic's crew's conduct betrayed that principle, faulting them for miniscule delays—as brief as 27 seconds—without any recognition of the intense consideration required to comprehend an emergent situation, evaluate the available options and their risks, and to act. The court's decision cannot be reconciled with at least two nearly identical cases, which assigned the overtaking vessel 100% of the fault under far-less dire and uncertain circumstances than the ALNIC's crew found themselves in. These errors of hindsight bias pervade the district court's entire opinion and require vacatur.

**B.** The district court held that ALNIC was "free to maneuver" under the COLREGS when MCCAIN energized its red-over-red lights. But the court never determined whether MCCAIN properly signaled "not under command" by *de-energizing* all other lights. In fact, substantial evidence supports a finding that the masthead lights remained illuminated, in which case ALNIC couldn't have known that MCCAIN's crew (mistakenly) believed

30

the warship was not under command. But, even if MCCAIN had properly signaled "not under command," that alone was insufficient to relieve ALNIC of its duty to maintain its course and speed when there was no indication that MCCAIN wasn't taking appropriate action. The district court's contrary holding is based on numerous factual and legal errors, which fundamentally undermine the allocation of fault and therefore must be vacated.

**C.** The district court faulted ALNIC for failing to take actions to mitigate damage to MCCAIN. But the court's holdings are rife with clear errors. There is no evidence to support the court's finding that a different impact would have, in fact, done less damage; it is just as likely that it would have done more, such as by opening more of MCCAIN's compartments to flooding. Likewise, there is no evidence to support the court's finding that—in the 66 seconds between the collision and when the ships separated—ALNIC's crew could have done anything to stop the massive tanker's forward momentum or otherwise mitigate the damage to MCCAIN.

**D.** The district court improperly considered the post-collision conduct of ALNIC's crew, who falsified the ship's logs after the collision. This Court has adopted a rule of evidence under which such conduct is relevant when determining disputed facts. But, here, the relevant facts are undisputed, and

the district court instead considered post-collision conduct in determining the relevant standard of care. That is a legal conclusion, not an evidentiary question, and the court therefore erred in considering post-collision conduct.

**II.** The district court ignored the SIAA's and PVA's express waivers of sovereign immunity and instead applied a judicially created exception—the *Feres* doctrine—to bar Petitioner's counterclaim. That was error. Nothing required the district court to extend *Feres* to a case, like this, where the United States invoked the court's jurisdiction by filing an affirmative claim. Nor does the court's reasoning—which relied on supposed harms to military discipline—make sense on its own terms considering the United States *itself* called MCCAIN's officers and crew as witnesses in its affirmative case. Petitioner's contribution claim cannot possibly cause any *further* harm to military discipline.

There are many reasons to reject the United States' call to extend *Feres*. It's barred by recent Supreme Court cases, it's grossly unfair, and it's inconsistent with other precedents in admiralty and equity. The SIAA and PVA should be applied as written, and the dismissal of ALNIC's contribution counterclaim should be reversed.

32

# ARGUMENT

## I.   The District Court Erred in Allocating Fault to ALNIC.

### A.   The district court failed to take into account the emergent circumstances and instead improperly relied on hindsight.

The district court made several errors of law and fact, any one of which would be sufficient to vacate the court's allocation of fault. *See infra* Sections I.B-D. But the original sin that pervades the court's decision was its substitution of hindsight—based on perfect knowledge of the ultimate outcome and carefully rehearsed simulations of what could have been—for the realities of the exigency the ALNIC found itself in, with all of its uncertainties and risks. Had the court properly viewed the incident from Master Nolasco's perspective on ALNIC's bridge on that moonless morning in the crowded strait, when an overtaking warship careened suddenly across ALNIC's bow, the court would not have allocated ALNIC any fault.

### 1.   Vessels in extremis must not be judged according to hindsight.

This Court has long advised that courts "must be careful to 'judge the conduct of the master of a vessel in the light of the circumstances which he faced at that time … and not as they may have appeared to one looking back at them several hours or several days later.'" *M.P. Howlett, Inc. v. Tug Michael Moran*, 425 F.2d 619, 622 (2d Cir. 1970) (quoting *Esso*, 387 F.2d at 582).

"It does not become negligence because the decision [a vessel's master] makes may later, in the light of subsequent events revealed through hindsight, be shown to have been wrong." *Esso*, 387 F.2d at 580. Rather, courts must consider carefully the "particular circumstances facing the captain in his hour of decision," *M.P. Howlett*, 425 F.2d at 623, and "steel [themselves] against the temptation to substitute hindsight 'in the peace of a quiet chamber,'" *Farrell Lines, Inc. v. S.S. Birkenstein*, 207 F. Supp. 500, 509 (S.D.N.Y. 1962) (Friendly, J.); *see Mamiye Bros.*, 360 F.2d at 780 (Friendly, J.) ("[I]t is necessary to resist the strong human temptation to review action by looking backward 'with the wisdom born of the event[.]'").

This Court has specifically cautioned against relying too heavily on the "assertions of … experts, based as they are on incomplete facts together with hindsight," to second guess a master's choices. *M.P. Howlett*, 425 F.2d at 622. Experts' "hypotheses as to conditions" simply cannot capture the "tremendous realities" that captains often face. *Olsen v. Luckenbach*, 238 F. 237, 240 (S.D.N.Y. 1916); *see The Mary T. Tracy*, 298 F. 528, 530 (S.D.N.Y. 1920) (dismissing expert's testimony as "but the old story of being able to tell, after the event, what should have been done" notwithstanding that "the critics

34

[*i.e.*, experts] were not there, and were not confronted with the problem nor the emergency"), *rev'd on other grounds*, 8 F.2d 591 (2d Cir. 1925).

These admonitions hold especially true when a ship and its crew are placed suddenly *in extremis* and are forced to react to danger—sometimes in mere seconds or minutes—based on incomplete information. "The master of a vessel caught in an emergency where he is forced to choose between risky alternatives, is entitled to a wide range of discretion in deciding what to do, provided it is a reasonable exercise of current standards of nautical knowledge and skill under the circumstances." *Esso*, 387 F.2d at 580. "It is easy" for courts "to criticize the conduct of [a vessel's master] in a great crisis," *Olsen*, 238 F. at 240, but "[a ship] is not to be held responsible because the master, in an emergency, did not do precisely what, after the event, others may think would have been best," *The Hercules*, 73 F. 255, 258 (2d Cir. 1896). That is especially so where the vessel did not itself create the perilous condition, and "[n]o choice [the vessel's] master could have made would have been free from danger." *The Mohegan*, 28 F.2d 795, 796 (2d Cir. 1928).

The Singapore High Court applied these principles in *The Tian E Zuo* [2019] 4 SLR 475. Quoting at length from the opinions in the "*locus classicus* case" of *The Bywell Castle* (1879) 4 PD 219, the High Court explained:

[A] ship has no right, by its own misconduct, to put another ship into a situation of extreme peril, and then charge that other ship with misconduct…. [I]f, in that moment of extreme peril and difficulty, such other ship happens to do something wrong, so as to be a contributory to the mischief, that would not render her liable for the damage, inasmuch as perfect presence of mind, accurate judgment, and promptitude under all circumstances are not to be expected.

…

[W]hen one ship, by her wrongful act, suddenly puts another ship into a position of difficulty of this kind, we cannot expect the same amount of skill as we should under other circumstances. The captains of ships are bound to shew such skill as persons of their position with ordinary nerve ought to shew under the circumstances. But any Court ought to make the very greatest allowance for a captain or pilot suddenly put into such difficult circumstances; and the Court ought not, in fairness and justice to him, to require perfect nerve and presence of mind, enabling him to do the best thing possible.

*The Tian E Zuo*, *supra*, at [33]-[34].

> 2. *The district court's second-by-second scrutiny of ALNIC's conduct is the result of hindsight bias.*

It is undisputable—and the district court correctly found—that the ALNIC's master and crew were not responsible for the perilous conditions that they found themselves in on that moonless night: "[T]here is no question MCCAIN created the situation of danger in the Singapore Strait." SPA-46. And that exigency was entirely unforeseeable: "No reasonable mariner would have expected MCCAIN to veer sharply off-course in one of the busiest waterways in the world—all because of unforced errors on the bridge." *Id.*

Accordingly, the district court "ought to [have] ma[de] the very greatest allowance for [ALNIC's] captain," and ought not to have expected him to have acted with "perfect presence of mind, accurate judgment, and promptitude." *The Tian E Zuo*, *supra*, at [33]-[34]. The court did the opposite. While purporting to "recognize[] that hindsight is 20/20" (SPA-57), the court Faulted ALNIC's captain and crew for not acting with godlike precision, foresight, and speed. It nitpicked their every move, with minute-by-minute, second-by-second scrutiny. And it expected them to flawlessly execute daredevil maneuvers—based on little more than a hunch and a prayer—while surrounded by other vessels in the middle of one of the world's busiest shipping lanes and that it took an expert in a simulator dozens of tries to master. The court could only have reached those conclusions based on hindsight.

**A.** Start with the district court's analysis of the 1 minute 52 seconds between when MCCAIN energized its red-over-red lights (05:21:25) to the time Master Nolasco realized MCCAIN was doing the "wrong maneuver" (05:23:17). According to the district court, ALNIC was permitted (though not obligated), under the COLREGS, to take evasive action as soon as MCCAIN

37

energized its red-over-red lights. SPA-56.[5] At that point, it is undisputed that if ALNIC had ordered a full stop or crash astern, it could have narrowly avoided the collision. SPA-37.

But ALNIC had *no reason* to take such drastic action. As the district court acknowledged, even at 05:22:31—a full minute after MCCAIN energized red-over-red—"MCCAIN's course had only shifted about 22 degrees towards ALNIC." SPA-39. "The destroyer was only slightly forward of ALNIC's beam—essentially driving side-by-side in the neighboring lane on the highway. At that moment, *reasonable mariners could have disagreed whether MCCAIN would collide with ALNIC*, especially because MCCAIN had not yet started to turn faster and faster on account of additional thrust and rudder problems." *Id.* (emphasis added). So even at 05:22:31, it was "reasonable"— that is, *not negligent*—for ALNIC to maintain its course and speed. SPA-38-39.

So the actually relevant period begins *after* 05:22:31 (1'27" to collision), at which point it is uncontested that even a crash astern order would *not*

---

[5] The district court's determination is incorrect, as explained below. MCCAIN did not properly signal "not under command," and it was not apparent that MCCAIN was not taking appropriate action, so ALNIC was still obligated to maintain its course and speed under the COLREGS. *See infra* Section I.B.

have slowed the tanker enough to avoid a collision. SPA-38-39. The district court nevertheless faulted ALNIC's captain for not taking one of two "evasive maneuver[s]." SPA-39. According to the court, Master Nolasco could have "turn[ed] to starboard, toward MCCAIN, and just miss[ed] the destroyer's stern"; or he could have "turn[ed] to port, away from MCCAIN." SPA-37-38.[6]

The last chance ALNIC had to execute these maneuvers was between 60 and 39 seconds before the collision. *Id.* In other words, within 27 to 47 seconds after 05:22:31—and under extreme pressure and uncertainty—ALNIC's captain would have had to comprehend the situation, evaluate his options and the associated risks, make a decision, and then order the tanker to take drastic action: either turn hard to starboard, *toward* the speeding warship, on the

---

[6] That finding was contrary to the opinions of both sides' experts, who agreed that a turn to port wouldn't have been an appropriate maneuver. The United States' expert never even modeled that maneuver because it "was not a natural reaction [he] would expect a master to take in a situation like this." Tr. 362:5-15 (note: "quarter" at line 6 should read "port"). Petitioner's expert was unequivocal: "I wouldn't consider going to port." Tr. 498:13.

Remarkably, the district court's conclusion that these maneuvers were "feasible" was based on the perplexing assertion by the United States' expert that massive oil tankers like ALNIC "commonly make such evasive maneuvers," to "evade" floating "buoys," "fishing nets," and even "whales." SPA-39. Even if the expert believed tankers in open waters sometimes undertake "evasive maneuvers," that doesn't establish such maneuvers were possible in a narrow shipping lane while surrounded by fast-moving vessels—especially considering his admission that he had almost no experience aboard a tanker of ALNIC's size. Tr. 351:7-14.

assumption that MCCAIN would continue turning to port and not correct course into ALNIC; or turn hard to port, *away* from MCCAIN but potentially *into* the path of the HYUNDAI GLOBAL, which was overtaking on ALNIC's port side.[7]

Once Master Nolasco realized MCCAIN was doing the "wrong maneuver" at 05:23:17—only 41 seconds before the collision—it is undisputed that ALNIC couldn't have done anything to avoid the collision. SPA-57-58. The district court nonetheless faulted ALNIC's captain for failing to act *immediately*

---

[7] The district court also held that "[u]nderstaffing Alnic's bridge was a proximate cause of the collision," reasoning that "[w]ith better focus on MCCAIN's erratic course, ALNIC could have slowed earlier as the destroyer approached" or "executed [a] swerving maneuver." SPA-53-54. But this finding is not supported by any evidence. It was undisputed that visually detecting course changes when two vessels are abeam is essentially impossible (especially at night); as late as 05:22:31, "reasonable mariners could have disagreed whether MCCAIN would collide with ALNIC" (SPA-39); and, as the stand-on vessel, ALNIC had a duty to maintain its course and speed until it became apparent that not taking appropriate action. *See infra* Section I.B. Having an additional crewmember on the bridgewing would not have changed any of those facts.

The district court further speculated that a lookout "might have" heard the "loss of steering" announcement over MCCAIN's PA system. SPA-54. That announcement was picked up by microphones on ALNIC, and was audible (if at all) through audio enhancement. A-7341 (audio recording), *available at* https://www.youtube.com/watch?v=K7KAgHtlJg; A-7345 (transcript). There was no evidence—and the district court did not find—that this announcement, which was directed at MCCAIN's crew, could have been heard or understood from ALNIC's bridgewing. *See* Tr. 369:23-370:20.

to mitigate the damage.[8] While Master Nolasco did reduce ALNIC's thrust before impact, the district court held that he took *too long*—that is, a mere 27 seconds—to evaluate the situation, consider his options and the risks, and ultimately decide to pull back on the throttle. SPA-33-34, 58.

**b.** To say that "[n]o choice" facing ALNIC's crew "would have been free from danger" would be an understatement. *The Mohegan*, 28 F.2d at 796. Turning, slowing, and holding steady all bore their own risks. It is *only through hindsight*—by unwinding the complex chain of events from a known endpoint—that anyone could possibly know that one of these extreme maneuvers might have succeeded, that turning at a specific moment in time could have narrowly avoided a collision instead of causing one, or that McCAIN was going to turn further to port and not correct course or abruptly stop. The United States' expert, for example, came to his conclusions only after running *35 to 40* simulations of the collision—in a carefully controlled environment and with perfect knowledge about McCAIN's course and speed

---

[8] The district court's conclusion that ALNIC could have done anything to mitigate the collision at this point lacks factual basis and is erroneous for the reasons discussed below. *See infra* Section I.C.

and how the collision actually occurred. Tr. 366:7-367:3.[9] That's quite a different experience from ALNIC's crew. As the United States' expert admitted, "they didn't have the benefit of seeing the radar replay several times, sitting in a simulator, trying [it] out a few times, [and] seeing how things worked out before they had to [decide] what to do." Tr. 366:23-377:3. MCCAIN, moreover, wasn't just some other vessel; it was a heavily armed warship, moving at extreme speed. ALNIC's crew couldn't have known how MCCAIN would've reacted if they'd turned *into* the warship's path.

This is the district court's principle error: It faulted ALNIC for making a choice that, "in the light of subsequent events revealed through hindsight," the court determined "to have been wrong." *Esso*, 387 F.2d at 580. And it did so by focusing on hypothetical alternatives (developed only after *dozens* of runs in a simulator), without considering the "tremendous realities" that Master Nolasco and his crew faced when the MCCAIN veered suddenly into their path. *Olsen*, 238 F. at 240. In other words, by analyzing the collision "retrospectively," the court imposed on Master Nolasco "a duty to foresee

---

[9]    Even the United States' expert admitted that, with MCCAIN and the other ships so close, one of the maneuvers the district court identified—turning to port—"was not a natural reaction you would expect a master to take in a situation like this." Tr. 362:5-15. So unnatural, in fact, that he didn't even simulate it.

future happenings which were mere possibilities and of which there was, at the time he exercised his judgment, no evidence." *Esso*, 387 F.2d at 580.

The district court also erred in holding ALNIC to the highest standard of conduct. In deciding that ALNIC should have executed an evasive maneuver, the court expected ALNIC's crew to display extraordinary skill and judgment far beyond "such skill as persons … with ordinary nerve [could be expected to] shew under the circumstances." *The Tian E Zuo, supra,* at [34]. Under the circumstances, turning hard to either starboard (into MCCAIN) or port (into the paths of other ships) would have taken super-human spatial awareness, lightning-fast reflexes, and flawless execution—not to mention nerves of steel. Even the United States' expert admitted that, before ALNIC's crew could act, they had "to process what they are seeing to understand what's happening," after which "they've got to figure out what their options are," and then "assess the risk associated with taking each of the options they've identified" and "make a determination of what response to take." Tr. 365:6-366:4. Only then could they "actually take that action." Tr. 366:5-6. The district court didn't take any of that into account, instead expecting nearly instantaneous reaction times.

It is in precisely in these circumstances—when perils emerge without warning and difficult choices must be made under conditions of uncertainty—that courts "cannot expect the same amount of skill as … under other circumstances" but instead should grant the "very greatest allowance" to the ship *in extremis. The Tian E Zuo, supra,* at [34]; *see The Hercules,* 73 F. at 258 ("[A ship] is not to be held responsible because the master, in an emergency, did not do precisely what, after the event, others may think would have been best."); *The Frosta* [1973] 2 Lloyd's Rep 348, 356 ("Even if it could be shown by calculation after the event that the chief officer acted a little too early or late, his decision made at the time would have to be judged with latitude."). The district court's second-by-second scrutiny granted ALNIC's crew *no* allowances and instead held them to an impossible standard.

> 3. *In nearly identical cases, courts attributed all fault to the overtaking vessel.*

This Court must determine negligence *de novo. See Esso,* 387 F.2d at 579-80; *Mamiye Bros.,* 360 F.2d at 776 (Friendly, J.). Reversal is appropriate under this standard because the district court decision "'manifests an incorrect conception of the applicable law'" by failing to account for the extreme circumstances ALNIC encountered as a result of MCCAIN'S negligent conduct. *Id.* at 580 (citation omitted). This Court has also reversed district court deci-

sions finding negligence "where contrary decisions rest on exactly the same facts." *Dinnerstein v. United States*, 486 F.2d 34, 37 n.2 (2d Cir. 1973). There are two decisions ALNIC raised below that involve nearly identical facts in which courts found the stand-on vessels not negligent at all. Those decisions compel reversal.

The first is *The Frosta* [1973] 2 Lloyd's Rep 348.[10] The court found the overtaking vessel entirely at fault for a collision because it overtook the stand-on vessel too close, had a defect in its steering gear, and failed to stop its engines upon experiencing a steering defect that caused it to turn abruptly into the path of the stand-on vessel. The court also found that the plaintiff's vessel was *not* negligent at all. Its failure to switch from automatic to hand steering had no impact on its ability to avoid the collision because it took only "about one second" to begin hand steering. *Id.* at 356. Nor was the plaintiff's vessel at fault for failing to notice the defendant vessel's not-under-command lights because the evidence established that the defendant failed to switch off the masthead lights as required by the Collision Regulations and there was not enough time to respond in any event after the overtaking ves-

---

[10]   Singapore courts consider admiralty precedents from other common-law countries persuasive authority. SPA-42-43.

sel illuminated the lights. *Id.* Last, the plaintiff's vessel was not at fault for failing to turn sooner or harder to avoid the collision because, as the stand-on vessel, it was required to keep her course and speed "until she found herself so close to the [overtaking vessel] that collision could not be avoided by the action of the [overtaking vessel] alone." *Id.* Noting that the plaintiff's vessel turned to starboard about 1¼ minutes before the collision, the court concluded that "[e]ven if it could be shown by calculation after the event that the chief officer acted a little early or late, his decision made at the time would have to be judged with latitude." *Id.*

The second decision is *The Fogo* [1967] 2 Lloyd's Rep 208. As in *The Frosta*, the overtaking vessel was found entirely at fault for a collision that occurred after it experienced a malfunction in its automatic steering. As in *The Frosta*, the stand-on vessel was found not negligent despite not turning sooner to avoid the collision and not sounding warning whistles. *Id.* at 220. And, also as in *The Frosta*, the court rejecting the argument that the stand-on vessel should have turned to avoid "the imminent risk of collision" because there was no evidence "that any situation of imminent danger had arisen" so that there was nothing that required a departure from the stand-on vessel's "primary duty" to maintain her course and speed. *Id.* Last, the court found

"even if [the stand-on vessel] was wrong" to not stop its engines sooner, that error was "no more than a pardonable error of judgment in a difficult situation." *Id.*

The circumstances ALNIC encountered weigh more heavily in favor of a finding that it was not negligent than the stand-on vessels in *The Frosta* and *The Fogo*. First, MCCAIN'S negligence is far greater than the overtaking vessels in those cases. It includes Commander Sanchez's improper decision to delay the transition to Sea and Anchor detail, as well as the fact that MCCAIN overtook ALNIC too closely *and* at too high speed in the crowded shipping lane. Plus, MCCAIN never experienced a steering malfunction and instead caused the collision through the crew's reliance on manual backup mode without proper training or understanding. Second, as the stand-on vessel, ALNIC also encountered more extreme circumstances than in both *The Frosta* and *The Fogo*—there is no evidence MCCAIN properly de-energized its masthead lights (in violation of the COLREGS) and by the time it became apparent that MCCAIN was not taking appropriate action to avoid the stand-on vessel, ALNIC had only less than one minute to avoid a collision by executing maneuvers that were far more extreme than the mitigating actions avail-

able to the stand-on vessels in *The Frosta* and *The Fogo*. And ALNIC had to make these decisions in pitch-black conditions, surrounded by other vessels.

Unlike the district court here, *The Fogo* and *The Frosta* heeded two fundamental maritime principles: Overtaking vessels must do so safely and carefully, while stand-on vessels must act predictably and maintain their course and speed until it is apparent the overtaking vessel is not taking appropriate action. *The Roanoke* [1908] P 231 [240]; *The Otranto* [1931] A.C. 194 [201]. And, also unlike the district court here, *The Fogo* and *The Frosta* properly recognized that reviewing courts must not rely on what is known in hindsight when judging the actions a stand-on vessel is forced to take in response to an overtaking vessel's negligent conduct. Because the district court both failed to properly apply the law and departed from prior decisions involving identical facts, this Court should reverse.

B.  **The district court erred in holding that ALNIC was "free to maneuver" when MCCAIN energized its red-over-red lights.**

It is undisputed that, as the stand-on vessel, "ALNIC had a baseline duty under Rule 17(a)(i) to maintain course and speed as MCCAIN passed by," thereby ensuring that "ALNIC would remain predictable to vessels attempting to maneuver around it" (SPA-55), while MCCAIN had a corresponding duty to keep clear of ALNIC under Rule 13(a). Under Rule 17, ALNIC was *for-*

*bidden* from turning or slowing, unless and until "it bec[ame] apparent to her that the vessel required to keep out of the way"—MCCAIN—"[was] not taking appropriate action in compliance with [the COLREGS]." COLREGS Rule 17(a)(ii).[11]

The district court concluded that "ALNIC was free to maneuver under Rule 17(a)(ii) once MCCAIN's red-over-red lights were energized at 5:21:25." SPA-56. As a preliminary matter, MCCAIN was never entitled to display "not under command" under the COLREGS because the warship was, in fact, fully operational—notwithstanding the crew's mistaken belief that they had lost steering. *See* Marsden & Gault, *Collisions at Sea* ¶ 5-155 (14th ed. 2006); Allen & Allen, *Farwell's Rules of the Nautical Road* 57 (9th ed. 2020). But, more importantly, the court failed even to make a finding that MCCAIN had properly displayed "not under command" by *de-energizing* its masthead lights (as required by the COLREGS). The evidence, in fact, demonstrated that MCCAIN's masthead lights remained illuminated.

In the absence of any evidence MCCAIN de-energized its masthead lights, ALNIC would have had no way to know that MCCAIN's crew (mistaken-

---

[11]   MCCAIN had a duty to steer clear of ALNIC *even if* the warship was not under command. *See* COLREGS Rules 13(a), 18(a)(i); Tr. 377:19-25; DE 372 at 21-22.

ly) believed they couldn't control the warship. Moreover, even if MCCAIN had properly signaled "not under command," that display alone was insufficient to relieve ALNIC of its duty to maintain its course and speed in the crowded shipping lane absent evidence that MCCAIN was not "taking appropriate action." The district court's finding that ALNIC was permitted to alter its course or speed under Rule 17(a)(ii) therefore must be vacated.

1. *The district court failed to find that MCCAIN de-energized its masthead lights.*

The district court correctly recognized that, to signal that the vessel was not under command, MCCAIN's crew had to take two actions: They had to *energize* the warship's red-over-red lights, and they had to *de-energize* the white masthead lights. SPA-7. This second step is crucial. Under the COLREGS, a ship is not signaling that it is "not under command" if its masthead lights remain illuminated: A "vessel not under command shall exhibit … [t]wo all-round red lights in a vertical line," "sidelights," "a sternlight," Rule 27(a), and "no other lights," Rule 20(b). Moreover, as a practical matter, the brighter masthead lights can obscure the red-over-red lights. *See The Frosta*, 2 Lloyd's Rep at 357.

Here, the district court found that MCCAIN energized red-over-red at approximately 05:21:25. SPA-25-26. But the court did not determine whether

MCCAIN ever de-energized its masthead lights. The court didn't even acknowledge the issue, notwithstanding the fact that Petitioner had argued that there was, in fact, evidence that MCCAIN had kept its white masthead lights illuminated. *See* DE 371, FOF ¶¶ 231-35; DE 372 at 17-21. Indeed, despite the United States having the burden of proof on this issue, none of MCCAIN's crew testified that they de-energized the white lights or that they saw that the white lights no longer were illuminated, and, when shown a picture of the light switches, none could identify the separate switch for the white lights. DE 371, FOF ¶ 234.

The court's conclusion that ALNIC was negligent for not acting under Rule 17(a)(ii) to slow or turn rested entirely on the premise that the MCCAIN properly communicated to surrounding vessels that it was a vessel not under command. SPA-25-27, 39, 56-57. But if MCCAIN never de-energized its masthead lights, then ALNIC's crew cannot possibly be expected to have understood that MCCAIN was signaling "not under command." In pitch-black conditions, and with Singapore's city lights in the background and MCCAIN on a roughly parallel course to ALNIC, it would have been all but impossible for surrounding vessels to perceive or understand that MCCAIN was trying to

signal that it was not under command if it never actually de-energized its white masthead lights. *See, e.g.*, Tr. 388:18-389:17, 665:17-666:2.

In the absence of any evidence that McCain properly signaled that it was not under command, leaving the decision below in place creates a dangerous requirement for stand-on vessels to abandon their obligation to maintain their course and speed based on little more than a hunch about what surrounding vessels might do. This ignores the real perils that can occur when a stand-on vessel misreads an overtaking vessel and acts improperly under Rule 17 by abandoning its obligation to maintain course and speed. *See In re Potomac Transp., Inc.*, 741 F. Supp. 394, 404-05 (S.D.N.Y. 1989) (stand-on vessel's "change of course was a blatant violation of Rule 17(a)(i)" and not authorized by Rule 17(a)(ii) to avoid overtaking vessel which had changed course and was not going to collide).

> 2. *It was not "apparent" that McCain was not "taking appropriate action" when it energized red-over-red.*

Even if the district court *had* found that MCCAIN properly signaled "not under command," that signal alone was insufficient to trigger Rule 17(a)(ii).

When MCCAIN energized red-over-red at approximately 05:21:25 (2'33" to collision), the warship was still on course. Commander Sanchez wouldn't

give the order to reduce speed—causing the hard port turn—for another 41 seconds. Even at 05:21:52 (nearly 30 seconds *after* MCCAIN energized red-over-red), ALNIC's radar showed MCCAIN, still at speed, drifting *only slightly* to port:



A-7341 (video still, cropped, with ships labeled for clarity).[12]

---

[12] "The antenna on ALNIC's radars rotated every 2.5 seconds, generating red-colored trails of surrounding vessels after each sweep." SPA-13. "[T]he direction and length of the trail" indicated the course and speed of the vessels: "The longer the red trail, the faster a nearby vessel was traveling." *Id.* The United States' expert testified that the radar trails were the best tool for monitoring MCCAIN during this period. Tr. 395:17-21.

ALNIC's voyage data recorder recorded images of ALNIC's radar at 15-second intervals. A video compilation of these images, together with audio recorded from ALNIC's bridge, was introduced into evidence. A-7341, *available at* https://www.youtube.com/watch?v=xK7KAgHtlJg. The video's time stamp of 2100 hours reflects Greenwich Mean Time (0500 hours Singapore Standard Time).

Even assuming ALNIC's crew had a visual sighting of MCCAIN—with properly configured not-under-command lights—it would not have "become apparent" to ALNIC that MCCAIN was not "taking appropriate action" to keep clear of ALNIC under Rule 17(a)(ii). *See* Tr. 497:12-500:7. As the United States' expert admitted, the mere fact that a vessel is displaying "not under command" does not identify the nature of the casualty (*e.g.*, loss of steering) or indicate *per se* that the vessel is not "taking appropriate action" under the COLREGS. *See* Tr. 368:22-369:3. And even if MCCAIN's full profile had been fully visible—not just its lights—it is undisputed that the minute change in aspect between the time MCCAIN inadvertently transferred steering away from the helmsman to the time it energized red-over-red would not have been visibly perceptible. Even the United States' expert agreed that visually detecting changes in aspect of a vessel abeam is very difficult even in full daylight, and even more so if the ship is only showing a red sidelight and red-over-red task lights, all of which are in almost a perfect vertical line. Tr. 388:20-389:17.

Even at 05:22:31 (1'27" to collision)—over a *full minute* after MCCAIN energized red-over-red—the district court acknowledged that it was not apparent (whether visually or by radar) that MCCAIN posed a threat:

MCCAIN's course had only shifted about 22 degrees towards AL-NIC. The destroyer was only slightly forward of ALNIC's beam—essentially driving side-by-side in the neighboring lane on the highway. At that moment, *reasonable mariners could have disagreed whether MCCAIN would collide with ALNIC*, especially because MCCAIN had not yet started to turn faster and faster on account of additional thrust and rudder problems.

SPA-38-39 (emphasis added; citation omitted). Moreover, at any time, MCCAIN *could have* communicated its (perceived) loss of steering by making 5 short blasts with its whistle or hailing ALNIC on its radio, but it took neither step, as the district court recognized. SPA-34.[13]

Simply put, no information available to ALNIC when MCCAIN energized red-over-red indicated that MCCAIN was not "taking appropriate action," much less that a collision was even remotely possible. Accordingly, when MCCAIN energized red-over-red, ALNIC remained the stand-on vessel under

---

[13] The district court's invocation of Rule 8(e) (*see* SPA-56-57) misses the mark. Rule 8(e) is directed at the *give-way vessel* (MCCAIN); it does not overcome the duty of the stand-on vessel (ALNIC) to maintain course and speed. *See Nautical Challenge Ltd. v Evergreen Marine (UK) Ltd.* [2021] 1 WLR 1436, 1454; COLREGS Rule 8(a) (providing that any action taken under Rule 8 must comply with Rule 17). Moreover, under these circumstances—surrounded by other vessels and with no indication MCCAIN posed a threat—it would have made no sense (and would've created additional dangers) for ALNIC to have altered course when MCCAIN first displayed red-over-red. At that point, ALNIC had no information that a collision with MCCAIN was remotely possible (SPA-38-39), so even if Rule 8(e) applied, ALNIC's duty to act had not arisen.

Rule 17(a)(i), with an affirmative duty to *all* of the surrounding overtaking vessels—not only McCain, but also Guang Zhou Wan and Hyundai Global—to maintain course and speed in the crowded shipping lane. Tr. 497:12-500:7. The district court's contrary conclusion—that Alnic was free to slow, or even turn, in the pitch-black conditions, surrounded by overtaking vessels—not only reflects the hindsight bias pervades the court's entire analysis; it incorrectly applied the COLREGS as a matter of law.

**C. The district court erred in finding that Alnic failed to mitigate the damage to McCain.**

The district court's findings that Alnic failed to take actions, both before and after the collision, to mitigate the damage to McCain lack any evidentiary support, are clearly erroneous, and must be vacated.

*1. There is no evidence that Alnic could have mitigated damage by turning to port.*

By the time the Court found Alnic was "required" to act under the COLREGS Rule 17(b)—with only *41 seconds* to impact—all parties agreed that no maneuver by Alnic could have avoided the collision. SPA-57-58. The district court nevertheless assigned blame to Alnic because the parties' experts "agreed that even within a minute of the collision, Alnic still had time to mitigate the force of impact by slowing or turning to port for a glancing

56

blow, rather than maintaining course and speed." SPA-38; *see* SPA-58 n.22. According to the court, "[a] combination of slowing and turning the tanker would have meaningfully mitigated the collision by reducing the force of impact and avoiding a T-bone." SPA-58.

This finding was clearly erroneous: No one testified that a glancing blow would have caused less damage to MCCAIN, and there certainly was no *agreement* among the experts on this point. Petitioner's expert agreed only that, if ALNIC had turned to port "as late as 5:23:13"—at which point a "collision was already unavoidable"—then the ship would have "wind[ed] up in a very different position than the angle of impact in the historic collision." Tr. 600:19-23. But he said nothing about whether a turn to port would have caused less damage to MCCAIN. As for the United States (which bore the burden of proof), its expert did state that ALNIC "should have turned to port, just to try to minimize damage." Tr. 340:13-14. But he provided no evidence that a glancing blow would have, in fact, "minimize[d] damage." *Id.* Rather, he admitted he "never analyzed in any way what the impact of a different collision … might have had relative to what actually happened." Tr. 408:16-409:3. And he affirmed that it "is not [his] opinion" that "the ALNIC might

somehow have mitigated the collision in some way," "by having taken some action in the very last moment." Tr. 408:24-409:3.

The court's fundamental error is that this factual question—whether a glancing blow would have caused less damage—lies far outside the ken of a layperson and thus must be supported by expert testimony. *See Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004). There was none. On this record, it is just as probable that a glancing blow would have opened more of MCCAIN's compartments and caused more flooding, or flooded MCCAIN's engine room, or ruptured ALNIC's tanks containing explosive pyrolysis fuel oil. The district court itself recognized how alterations to ALNIC's course might have worsened the collision and been far more deadly:

> The Court refuses to speculate about the better—or worse—locations that ALNIC could have hit. From the tanker's perspective, it would not have been clear what areas on the destroyer were deadly to hit and which were not. For example, if ALNIC had hit an area with explosive munitions, it is possible that the damage to both vessels (and the loss of life) would have been even greater.

SPA-58 n.22; *see The Frosta*, 2 Lloyd's Rep at 357 ("[W]hether [a] different collision would have been worse or better it is impossible to know."). The district court's evidence-free speculation that a more-glancing blow would have

caused less damage—together with the court's misapprehension that the parties' experts agreed on this point (SPA-38, 58 n.22)—requires vacatur.

### 2. There is no evidence that ALNIC could have mitigated damage after the collision.

Putting aside ALNIC's ability to slow or turn *before* the collision, the district court found that ALNIC's "most inexcusable fault" was failing to do anything to mitigate the damage *after* the collision. SPA-59. The district court concluded that ALNIC's failure to stop its engine and disengage the autopilot in the seconds following the collision exacerbated the damage by causing a "sweeping" motion through MCCAIN's hull as ALNIC's autopilot tried to steer the ship back on course. SPA-34-35. But nothing in the record supports the court's finding that—in the 66 seconds between the collision and when the ships separated—ALNIC's crew could have done anything to stop the sweep, halt the massive tanker's forward momentum, or otherwise mitigate the damage to MCCAIN, much less that ALNIC's post-collision conduct "substantially worsened the collision." SPA-59.

The evidence the court cited does not support its findings. The United States' expert opined that, following the collision, ALNIC's autopilot was set to turn ALNIC's rudders a maximum of 15 degrees to keep it on course. Tr. 341:16-25 (cited at SPA-34). But he didn't opine that turning the engines

59

or autopilot off sooner would have counteracted the enormous forces at work or mitigated the damage in any way. No. In fact, he *disclaimed* any opinion on mitigation and admitted he never tested the hypothesis. Tr. 408:16-409:3. Petitioner's expert agreed that the angle between the ships widened after the collision, as MCCAIN pivoted around and eventually separated from AL- NIC. Tr. 612:18-613:19 (cited at SPA-34-35). But that says nothing about whether any action by ALNIC's crew could have reduced the resulting dam- age.

The United States thus failed to carry its burden to prove a failure to mitigate, much less with the expert testimony necessary to understand the tremendous forces at work. *See Wills*, 379 F.3d at 46. If anything, the evi- dence demonstrated that a "sweeping motion" was inevitable, as a matter of physics, based on "the relative movement between both vessels." Tr. 450:2- 20. Upon impact, ALNIC's tremendous forward momentum caused MCCAIN to pivot around ALNIC, such that, when the vessels separated, the ships were positioned port to port. *See* A-5306-5310. The district court cited no evidence that, after impact, ALNIC's crew could have done anything to halt the massive tanker's momentum. In fact, evidence showed that it took seven full minutes just for the propellers to stop turning following a crash astern order, and far

60

longer to stop forward momentum. DE 371, FOF ¶¶ 59-60. And the record is devoid of *any* evidence about what force the autopilot might exert relative to the enormous forces of the vessels as they collided. The district court's contrary conclusion therefore lacks evidentiary support and must be vacated.

### D. The district court improperly considered ALNIC's crew's post-collision conduct.

Petitioner has consistently acknowledged that ALNIC's crew made false log entries and statements after the collision. DE 371, FOF ¶¶ 299-310. It is undisputed—and the district court acknowledged—that "the creation of false logs had no causative effect on a collision that had already taken place," and that "Petitioner has long since admitted the falsities, lessening their poisonous effect on the evidence presented at trial (much of which was undisputed)." SPA-60. Nevertheless, the district court relied on *Otal Invs. Ltd. v. M.V. Clary*, 494 F.3d 40 (2d Cir. 2007) ("*Otal II*"), to find that the false entries and statements demonstrated that ALNIC's crew knew the "proper standard of care." SPA-60. That was error.

In *Otal II*, this Court held that missing logbook entries "give rise to a presumption the logbook contained entries adverse to the vessel's contentions at trial." 494 F.3d at 58. This "rule of evidence," the Court explained, "is especially useful in cases where the facts that should have been entered are

not known, or at least are in dispute." *Id.* But where the "facts are known" or "admitted" or otherwise not "in dispute," "the presumption … add[s] nothing." *Id.* at 59.

The district court applied *Otal II* to hold that the altered logs demonstrated "the proper standard of care," and that ALNIC crew should have done what the falsified logs said they did, such as "slow[ing] the vessel minutes before the collision" and "stopp[ing] the engine two minutes before the collision." SPA-60. The fundamental flaw with the district court's analysis is that these are *legal conclusions* concerning the proper standard of care and ALNIC's duties under the COLREGS, not contested *facts*, resolvable by application of a "rule of evidence." *Otal II*, 494 F.3d at 58. The crew's subjective beliefs about the standard of care are irrelevant to whether they breached the actual standard of care. Even if someone *believed* they should have "slowed" or "stopped the engine" earlier (SPA-60), that doesn't prove that there was a factual basis for doing so in the moment, that such action would've been consistent with the COLREGS, or even that it would have prevented the collision. *Supra* Section I.B. The district court's consideration of the altered logs to draw legal conclusions requires vacatur.

## II. The United States Has Waived Immunity to Petitioner's Counter-claim for Contribution.

When Congress "unequivocally expresse[s]" its intent to waive sovereign immunity in statutory text, *Sossamon v. Texas*, 563 U.S. 277, 284 (2011), courts must apply the waiver as written and may not "narrow the waiver that Congress intended," *United States v. Idaho ex rel. Director, Idaho Dept. of Water Res.*, 508 U.S. 1, 7 (1993). The district court disregarded this principle and erased two statutory waivers of immunity enacted a century ago to provide a damages remedy against the United States for cases just like this one.

Under the Suits in Admiralty Act (SIAA) and Public Vessels Act (PVA), when the United States affirmatively asserts an admiralty claim against a shipowner, it waives sovereign immunity for all "counterclaims … for damages arising out of the same subject matter." 46 U.S.C. § 31102(b); *see* § 30903(a). Those express waivers apply squarely to Plaintiff's counterclaim for contribution, setoff, or indemnity, which arise out of personal injuries caused by the MCCAIN-ALNIC collision. Indeed, the United States never disputed that the contribution counterclaim falls within the scope of the SIAA and PVA's waivers of immunity; in fact, it never argued that sovereign immunity barred the counterclaim at all. The district court, however, decided on its own to extend the *Feres* doctrine to override

Congress's express waivers of sovereign immunity to counterclaims under the SIAA and PVA. That was error.

The district court's decision finds no basis in the holding of, or the rationales underlying, *Feres* and later cases. Neither *Feres* nor any other case applying it involved a contribution counterclaim brought under the SIAA or PVA in response to an affirmative damages claim by the United States. Yet the district court extended *Feres* based on its concern that allowing Petitioner's contribution claim would harm "military discipline." This makes no sense. The United States filed an affirmative claim against Petitioner and "pray[ed]" that "[Petitioner] be adjudged liable, without limitation, to the United States for the full amount of its damages and losses." A-317. After a full trial on the merits—at which the United States called its own high-ranking officers as witnesses—the district court found the United States 80% liable for the collision. Having voluntarily chosen to put its own liability at issue, it would be nonsensical—and grossly unfair—to permit the United States to invoke a judicially created exception to an express waiver of immunity to bar Petitioners' counterclaim arising out of exactly the same facts and evidence that underlie the United States' affirmative claim and which already are part of the record before the district court. The SIAA's and PVA's

waivers of sovereign immunity should be applied as written and to permit Petitioners' counterclaim allowed to proceed.

### A. The United States has expressly waived sovereign immunity with respect to counterclaims for any damages arising out of a collision with a public vessel.

The SIAA and PVA include broad waivers of the United States' sovereign immunity to maritime suits. 46 U.S.C. §§ 30903(a), 31102(b). And, key here, both statutes include separate express waivers of the United States' immunity to *counterclaims* whenever the United States brings admiralty claims against a private party. The Suits in Admiralty Act provides: "In a civil action in admiralty brought by the United States …, an admiralty claim in personam may be filed or a setoff claimed against the United States." § 30903(a). And the Public Vessels Act goes further: "If the United States brings a civil action in admiralty for damages caused by a privately owned vessel, the owner of the vessel, or the successor in interest, may file a *counterclaim* in personam, or *claim a setoff*, against the United States *for damages arising out of the same subject matter*." § 31102(b) (emphasis added). Thus, the United States has long recognized that it may be sued for contribution in admiralty. *See* Brief for United States at 8-9, 53-54, *United States v. Yellow Cab Co.*, 340 U.S. 543 (1951) (No. 218).

These overlapping waivers are "broad." *E.g.*, *U.S. Fire Ins. Co. v. United States*, 806 F.2d 1529, 1534 (11th Cir. 1986). They are not limited to certain types of claims or damages. *See Canadian Aviator v. United States*, 324 U.S. 215, 222 (1945). "[T]ogether, the sovereign immunity waivers of the PVA and the [SIAA] now cover all relevant admiralty claims involving public vessels." *Uralde v. United States*, 614 F.3d 1282, 1286 (11th Cir. 2010). And the Supreme Court has held that "Congressional adoption of [the PVA's] broad statutory language authorizing suit [against the United States] was deliberate and is not to be thwarted by an unduly restrictive interpretation." *Canadian Aviator*, 324 U.S. at 222.

The SIAA and PVA unequivocally waive sovereign immunity for counterclaims like Petitioner's and must be applied as written. *See Kirtz v. Trans Union LLC*, 46 F.4th 159, 164 (3d Cir. 2022). Tellingly, the United States has never taken the position (and the district court didn't hold) that either waiver is ambiguous or that Petitioner's contribution counterclaim does not fall within the waivers' scope. Petitioner's counterclaim—which relates to personal injuries and deaths caused by the same collision—plainly "arises out of the same subject matter" as the United States' claim and therefore falls within the SIAA's and PVA's broad waivers. 46 U.S.C. § 31102(b).

**B.** **The *Feres* doctrine does not bar Petitioner's counterclaim.**

The district court accepted that the SIAA and PVA expressly waive the United States' sovereign immunity to counterclaims. SPA-83-84. But the court disregarded the plain text of those waivers in favor of a judge-made exception, holding that it lacked jurisdiction over Petitioner's contribution counterclaim under *Feres v. United States*, 340 U.S. 135 (1950), and *Stencel Aero Engineering Corp. v. United States*, 431 U.S. 666 (1977). SPA-84-87. Because courts are not free to "narrow [a] waiver [of sovereign immunity] that Congress intended," *Idaho*, 508 U.S. at 7 (quotation marks omitted), the district court's extension of *Feres* and *Stencel* here must be reversed.

*Feres* and *Stencel* involved a different statutory scheme, a different waiver of sovereign immunity, and differently aligned parties. In *Feres*, the Supreme Court held that the United States had not waived its immunity to Federal Tort Claims Act (FTCA) suits brought directly by servicemembers against the United States for service-related injuries. 340 U.S. at 143-46. And in *Stencel*, the Court held that a private party could not maintain an indemnity cross-claim against the United States under the FTCA, where a servicemember sued both the private party and the United States jointly for service-related injuries. 431 U.S. at 672-74. In both cases, the United States was

an *unwilling* participant, haled into court as a *defendant*. Neither case concerned circumstances where the United States brought an affirmative claim against a private party, thereby intentionally availing itself of the court's jurisdiction and expressly waiving its immunity to all "counterclaims … arising out of the same subject matter." 46 U.S.C. § 31102(b).

The district court nonetheless held that "[t]he *Feres-Stencel* doctrine applies squarely to the facts of this case" based entirely on the fact that "[t]he Sailor-Claimants' claims [against Petitioner] undisputedly arise out of their military service." SPA-84. But that mechanical application of the doctrine ignores this case's unique procedural posture, which places it squarely within the scope of the SIAA and PVA and distinguishes it from *Feres*. Neither the court nor the United States identified a single case where, as here, the United States first invoked the district court's jurisdiction by filing an affirmative claim, the United States was awarded damages against the private shipowner, and then the district court barred the shipowner's contribution counterclaim under the *Feres* doctrine. The district court's extension of *Feres* to these circumstances is, quite literally, unprecedented.

The district court also attempted to justify its extension of the doctrine based on three rationales articulated by the Supreme Court in *Feres* and lat-

er cases: that barring Petitioner's counterclaim protects the "uniquely federal nature of the sovereign-soldier relationship"; that "the United States has implemented a statutory no-fault compensation scheme for the Sailor-Claimants through the Veterans' Benefits Act"; and that "allowing the Sailor-Claimants to sue the United States for the collision would have serious effects on military discipline." SPA-85. But none of these rationales survives scrutiny.

To start, the first two factors are "no longer controlling." *United States v. Shearer*, 473 U.S. 52, 58 n.4 (1985). Instead, *Feres* is "best explained by the peculiar and special relationship of the soldier to his superiors, the effect of the maintenance of such suits on discipline, and the extreme results that might obtain if suits under the [FTCA] were allowed for negligent orders given or negligent acts committed in the course of military duty." *Shearer*, 473 U.S. at 58 n.4. But even if this Court does consider the first two factors, they cut against any extension of *Feres*.

*First*, the United States' uniquely federal relationship with service-members is irrelevant to whether Petitioner's contribution claim should be permitted. In *Feres*, the Supreme Court reasoned that "the relationship of military personnel to the Government has been governed exclusively by fed-

eral law" and therefore concluded that Congress did not intend the FTCA to "create a new cause of action dependent on local law for service-connected injuries or death due to negligence." 340 U.S. at 146. Here, the relevant relationships are between the claimants (which include the United States and the Sailor-Claimants) and Petitioner. These relationships are not uniquely federal.

*Second*, the fact that the Sailor-Claimants may be compensated under the Veterans' Benefits Act is no reason to bar Petitioner's counterclaim. To the extent the United States argues that it has already paid compensation to the Sailor-Claimants under the VBA (or any other statutory scheme), the United States may seek to set off or recoup those payments against any contribution it owes Petitioner. But that is no reason for Petitioner to shoulder 100% of the Sailor-Claimants' claims when the district court assigned it only 20% of the fault.

*Third*—and most important—allowing Petitioner's counterclaim against the United States cannot possibly have any "effects on military discipline" whatsoever, much less "serious" ones. SPA-85. For its part, the district court started with the wrong question, asking whether "allowing *the Sailor-Claimants to sue the United States* for the collision would have seri-

ous effects on military discipline." *Id.* (emphasis added). The right question is whether permitting *Petitioner* to seek contribution from the United States—*after* the United States submitted to jurisdiction by filing an affirmative claim, *after* the United States waived sovereign immunity to all counter-claims, *after* the United States submitted thousands of pages of sensitive and confidential documents, *after* the United States subjected its own officers to direct and cross-examination, and *after* the United States was found 80% at fault for the collision—would have any *further* effect on military discipline. The answer to that question is plainly *no*.

Whatever harms to military discipline might arise from litigating the United States' fault, those harms have *already* come to pass—and at the United States' own hand. It was the United States that subjected its own officers and crew to depositions concerning the collision and that made extensive document productions concerning the casualty—including of its own classified and sensitive documents—and the Navy's investigation and discipline of responsible officers and crewmembers. It was the United States that called MCCAIN's commanding officer, chief petty officer, chief warrant officer, and chief engineer as live witnesses in its case-in-chief at trial. And it was the United States that submitted the deposition transcripts of five other

crew members in support of its claim, as well as numerous classified Navy documents and records. Based on that record, the district court determined that the United States was *overwhelmingly* to blame for the collision and, thus, the Sailor-Claimants' injuries. Any harm to military discipline caused by that determination has already been done, regardless of Petitioner's counterclaim.[14]

The United States can't have it both ways. Having relied on the evidence it introduced in support of its case in which it sought tens of millions of dollars in damages, the United States cannot now contend that it would be disruptive to "military discipline" to allow Petitioner to rely on this very same evidence to support its counterclaim. This is precisely why Congress enacted the SIAA's and PVA's statutory waivers in the first place: to prevent the United States from using its sovereign status as both a sword and a shield. *See* S. Rep. No. 941, at 2 (1925) (decrying the "injustice" of cases where the United States sued a private shipowner while also asserting immunity); H.R. Rep. No. 913, at 2 (1925) (same). This is especially so consider-

---

[14]  Concerns about harm to military discipline ring especially hollow considering that the United States also court martialed multiple officers and conducted publicly available investigations that harshly criticized the Navy and crew's conduct.

ing the case's procedural posture. The United States' claim against Petitioner required the district court to apportion responsibility for the collision so that the only issue remaining as far as Petitioner's counterclaim goes is to apply that apportionment to any amounts Petitioner pays to the Sailor-Claimants. It is procedurally impossible for Petitioner's contribution counterclaim to impact military discipline or readiness.

*Vulcan Materials Co. v. Massiah,* 645 F.3d 249 (4th Cir. 2011), is readily distinguishable, and the district court's reliance on it (SPA-86) reveals the court's failure to grapple with this case's unique procedural posture. In *Vulcan,* the United States was impleaded as a third-party defendant by Vulcan, the defendant shipowner, into an action originally brought by a wrongful-death claimant for loss resulting from a collision between the Vulcan's vessel and a Navy vessel. The United States filed a motion to dismiss under *Feres* and *Stencel,* but the district court deferred decision on the motion and the case proceeded to trial; only then did the United States file a counterclaim against the shipowner. The court found that the United States was 80% at fault for the collision and that Vulcan was 20% at fault. *In re Vulcan,* 647 F. Supp. 2d 756, 763-64 (E.D. Va. 2009). It was only after trial that the district court dismissed the United States as immune—notably, *without* granting the

United States any affirmative recovery against Vulcan, despite finding Vulcan 20% at fault for the collision. *Id.* at 769.

The Fourth Circuit affirmed. 645 F.3d 249. Relying on "the primacy of military discipline as the rationale underlying *Feres-Stencel Aero*," the court reasoned that Vulcan's third-party complaint against the United States had "resulted in numerous Navy witnesses being called into court to testify 'about their own actions and those of fellow servicemen'" and had put a "civilian court" in the position of "sitting in judgment of military decisions." *Id.* at 266. Based on these considerations, the court concluded that the SIAA and PVA did not waive the United States' immunity to Vulcan's third-party complaint. *Id.* at 267.

Key here, in *Vulcan*, the United States did *not* voluntarily submit itself to the district court's jurisdiction; it was impleaded into the suit as a nonconsenting third-party defendant, and when the United States was dismissed from the lawsuit, it was awarded no damages. As explained, the military discipline rationale relied on by the *Vulcan* court does not apply where the United States brings an affirmative claim, voluntarily subjects its own officers to direct and cross-examination, submits its own sensitive documents as evidence, and requests—and receives—a judicial determination of its fault

74

and liabilities. To be sure, that process will often entail a "civilian court sitting in judgment of military decisions." *Id.* at 266. But here, the United States *invited* the district court's judgment. And unlike *Vulcan*—where the United States was dismissed from the action and awarded no damages—the United States here has invoked the SIAA's and PVA's authorization to sue (and been awarded tens of millions of dollars in damages) while simultaneously attempting to evade those statutes' express waivers of immunity. These distinctions remove this case from the ambit of *Feres*, so that the SIAA's and PVA's waivers should be given full force.

C. **The Court should not extend *Feres* to counterclaims under the SIAA and PVA.**

Neither the holding nor the rationales of *Feres* support the application of the doctrine to cases like this, where the United States has asserted an affirmative admiralty claim against a private shipowner, thereby consenting to counterclaims arising out of the same subject matter. The decision below, therefore, dramatically *extends* the doctrine (and a widely discredited one at that). This Court should reject that approach and limit the doctrine to cases where the United States has not willingly subjected itself to jurisdiction by filing an affirmative claim.

*1.*     *This Court is not obligated to extend Feres.*

From the time it was decided, *Feres* has been the subject of "widespread, almost universal criticism." *Lanus v. United States*, 570 U.S. 932, 932 (2013) (Thomas, J., dissenting) (quoting *United States v. Johnson*, 481 U.S. 681, 700 (1987) (Scalia, J., dissenting)). Judges, lawyers, and commentators alike have decried the decision for its "remarkable" "willingness to ignore language, history, and the process of incremental law making," *Taber v. Maine*, 67 F.3d 1029, 1039 (2d Cir. 1995) (Calabresi, J.), and for the "unfairness and irrationality" of the outcomes it produces, *Ritchie v. United States*, 733 F.3d 871, 878 (9th Cir. 2013) (citation omitted); *see also Johnson*, 481 U.S. at 701 n.* (Scalia, J., dissenting) (citing numerous opinions and articles criticizing the doctrine). Many courts have only applied the doctrine "reluctantly," *e.g.*, *Scales v. United States*, 685 F.2d 970, 974 (5th Cir. 1982); *Veillette v. United States*, 615 F.2d 505, 506 (9th Cir. 1980), and "with a degree of regret," *Ortiz v. U.S. ex rel. Evans Army Cmty. Hosp.*, 786 F.3d 817, 822 (10th Cir. 2015), recognizing "the injustice … of [the doctrine's] result," *Hinkie v. United States*, 715 F.2d 96 (3d Cir. 1983). Others still have called upon the Supreme Court to overturn it. *E.g.*, *Peluso v. United States*, 474

F.2d 605, 606 (3d Cir. 1973); *Ritchie*, 733 F.3d at 879 (D.W. Nelson, J., concurring).

To be sure, this Court cannot overrule *Feres*. But nothing compels this Court to *extend* such a woefully erroneous and unfair doctrine to distinct legal and factual circumstances. "[I]f a faithful reading of precedent shows it is not directly controlling, the rule of law may dictate confining the precedent, rather than extending it further." *NLRB v. Int'l Ass'n of Bridge, Structural, Ornamental, & Reinforcing Iron Workers, Local 229*, 974 F.3d 1106, 1117 (9th Cir. 2020) (Bumatay, J., dissenting); *see Herr v. U.S. Forest Serv.*, 803 F.3d 809, 817 (6th Cir. 2015) ("*Stare decisis* may require courts to give respect to prior mistaken decisions.… But it does not require courts to extend them."). And here, many reasons counsel strongly *against* extending *Feres* to cases like this.

2. *Supreme Court precedent bars the extension of Feres to cases where Congress has expressly waived immunity.*

Congress does not lightly waive sovereign immunity. Consequently, the Supreme Court has recognized that when Congress does waive immunity, courts are not free to rewrite what Congress has done and may not "narrow the waiver that Congress intended." *Idaho*, 508 U.S. at 7. As the Third Circuit recently noted in enforcing another statutory waiver of sovereign

immunity, "where Congress has clearly expressed its intent, we may neither second-guess its choices nor decline to apply the law as written." *Kirtz*, 46 F.4th at 162. These principles arguably foreclose *Feres* and subsequent decisions, and they unquestionably preclude extending this judge-made doctrine to new realms that contravene clear statutory text.

### 3. *Extending Feres would be grossly unfair.*

Even if this Court could extend *Feres*, it shouldn't. Extending the doctrine to contribution counterclaims produces gross inequities by shifting *all* of a servicemember's damages to defendants who are only partly (even minimally) to blame. This case is a prime example: If the decision below stands, Petitioner will likely have to pay 100% percent of the Sailor-Claimants' damages, despite being only 20% at fault. *See McDermott, Inc. v. AmClyde*, 511 U.S. 202, 220 (1994) (joint and several liability "well-established" in admiralty). And even more inequitable cases may arise. *See, e.g.*, *Farmers Mut. Ins. Co. v. Appalachian Power Co.*, 78 F. App'x 259, 263 (4th Cir. 2003) (joint and several liability for defendant found only 1% at fault).[15] These inequities are

---

[15]    Granted, joint and several may result in one party paying more than their share of damages. But any unfairness is mitigated by the availability of contribution based on proportionate fault in admiralty. *See McDermott*, 511 U.S. at 220. Allowing *Feres* to trump contribution here is therefore a dramatic

even greater where, as here, the United States has invoked the SIAA's and PVA's authorization to sue (and been awarded tens of millions of dollars in damages) while simultaneously invoking *Feres* to evade the SIAA's and PVA's express immunity waivers. This Court can avoid such obvious unfairness by not extending *Feres*.

Enforcing the SIAA's and PVA's waivers as written treats the government (and servicemembers) fairly—and as Congress intended. The PVA puts the United States on notice that, if it *chooses* to file a suit or claim in admiralty, it has expressly consented to all "counterclaims … arising out of the same subject matter." 46 U.S.C. § 31102(b). This is an important distinction from *Feres* and the FTCA, where a broad waiver of immunity to suits brought not *by*, but *against*, the United States, could expose it to unforeseeable and potentially unlimited liability for all manner of military decisionmaking. Here, the United States can decide whether bringing an affirmative admiralty claim under the PVA is worth the potential downside of opening itself up to all counterclaims—including contribution counterclaims for service-related injuries.

---

break from how fault is typically handled in maritime cases and privileges the United States in a way that Congress never intended.

Permitting contribution counterclaims against the United States will impose no additional burden on litigants or the courts. Case in point: Petitioner's contribution claim is based on essentially the same evidence and findings as its claim against the United States for vessel damage; and the district court has already apportioned fault for the collision.

> 4. *Extending Feres would be inconsistent with longstanding precedent in maritime collision cases.*

Applying the SIAA's and PVA's waivers as written is not only fair; it is consistent with historical practice and congressional intent.

Even before the SIAA and PVA were enacted, many courts—including the Supreme Court—had held that "[w]henever the United States sues for damage inflicted on its vessel or cargo, it *impliedly* waives its exemption from admiralty jurisdiction as to cross libels or *counterclaims arising from the same transaction*." 2 Am. Jur. 2d Admiralty § 44 (emphasis added). Justice Holmes, writing for the Court in *The Western Maid*, explained that "when the United States came into court to enforce a claim it would be assumed to submit to just claims of third persons in respect of the same subject matter." 257 U.S. 419, 434 (1922). This principle reflected "the *consent of the sovereign power* to see full justice done in such circumstances." *Id.* (emphasis added). Even though such claims wouldn't be enforceable if brought in a

stand-alone suit against the sovereign, they would be "recognized in the interest of justice *when the sovereign came into court*." *Id.* (emphasis added).

Likewise, in *The Thekla*, Justice Holmes again recognized the same principle: "When the United States comes into Court to assert a claim it so far takes the position of a private suitor as to agree by implication that justice may be done with regard to the subject matter." 266 U.S. 328, 339-40 (1924). The Court continued:

> The reasons that have prevailed against creating a government liability in tort do not apply to a case like this, and on the other hand the reasons are strong for not obstructing the application of natural justice against the Government by technical formulas when justice can be done without endangering any public interest. As has been said in other cases the question of damages to the colliding vessel necessarily arose and it is reasonable for the Court to proceed to the determination of all the questions legitimately involved, even when it results in a judgment for damages against the United States.

*Id.* at 340-41; *see also United States v. Nat'l City Bank of N.Y.*, 83 F.2d 236, 238 (2d Cir. 1936) (citing cases).

Of course, this is not an *implied* waiver case. At the same time as the courts were recognizing implied waivers in cases where "the sovereign came into court," *The Western Maid*, 257 U.S. at 434, Congress was enacting the (even broader) *express* waivers in the SIAA and PVA. According to Congress, those waivers were specifically intended to remedy the "injustice" of

cases where "the United States, while immune from [suit], [would] sue the vessels of private owners, ha[ve] its day in court without the risk of costs being awarded against it, and, when the Government vessel [wa]s found to have been at fault, [would] refuse[] to pay the damages sustained by the private owner." S. Rep. No. 941, at 2 (1925); H.R. Rep. No. 913, at 2 (1925). Moreover, these statutory waivers were not limited to cross-libels for property damages to vessels (as some courts had held when finding implied waivers), but extended to counterclaims for personal injuries and other damages. *See Canadian Aviator*, 324 U.S. at 222. In other words, Congress waived the United States' immunity for counterclaims—including, specifically, counterclaims for personal injury—to prevent precisely the kind of unfairness created by dismissing Petitioner's counterclaim here.

5. *Extending Feres would be inconsistent with equitable recoupment.*

Extending *Feres* would also be inconsistent with the equitable doctrine of recoupment, which (partly) levels the playing field when the United States sues a private party for damages by allowing the defendant to recoup damages caused by the United States that arise out of the same transaction or occurrence.

Federal courts have long recognized that—even in the absence of any waiver of sovereign immunity—when the United States affirmatively invokes the jurisdiction of its courts as a plaintiff, equitable principles may entitle a defendant to set off any damages owed *to* the United States with damages caused *by* the United States. "Where the United States sues, the defendant, without relying on any other waiver of sovereign immunity, may recoup by counterclaim, to the extent of any amount awarded the United States, any damages which have arisen out of the same transaction or contract or subject of action." *United States v. Wessel, Duval & Co.*, 115 F. Supp. 678, 687 (S.D.N.Y. 1953); *see United States v. Forma*, 42 F.3d 759, 764 (2d Cir. 1994).

Under the doctrine, even where the court "has no power to award affirmative relief on [a defendant's] [counter]claim against the government" (because the government is immune), the defendant is still "entitled to assert its claim to diminish or defeat recovery by the government on its claim." *Complaint of American Export Lines, Inc.*, 568 F. Supp. 956, 961 (S.D.N.Y. 1983). And, notably, courts in this Circuit have long applied the doctrine in admiralty where the SIAA's and PVA's waivers did not apply. *E.g.*, *id.* at 960-62; *Wessel*, 115 F. Supp. at 687.

Here, of course, the SIAA's and PVA's waivers *do* apply to Petitioner's counterclaim and request for setoff—relief which is analogous to recoupment and, like counterclaims, expressly covered by the PVA. *See* 42 U.S.C. § 31102(b).[16] So it was unnecessary for Petitioner to expressly invoke recoupment below. But in cases where the United States has *not* waived immunity, courts commonly construe counterclaims and setoff claims as recoupment claims to avoid unfairness. *See, e.g.*, *Wessel*, 115 F. Supp. at 686-87. And the principles underlying recoupment—including "equity," "logic," and "waiver," *Forma*, 42 F.3d at 764-65—strongly support applying the SIAA's and PVA's express waivers as written and not extending *Feres* any further.

Finally, even if this Court does extend *Feres*, the Court should exercise its discretion to remand the case for the district court to apply equitable recoupment in the first instance to ensure that damages are equitably apportioned according to the parties' fault. *See Wessel*, 115 F. Supp. at 686-87.

---

[16] "[A] setoff is a reduction from an amount otherwise owed, and cannot result in a net recovery in favor of the party asserting the defense of setoff." *Norwalk Cove Marina, Inc. v. S/V ODYSSEUS*, 64 F. App'x 319, 321 (2d Cir. 2003).

**D. The United States' arguments are wrong.**

Below, the United States did not argue that *Feres* creates an exception to the SIAA's and PVA's waivers with respect to contribution counterclaims. The district court reached that conclusion on its own. Instead, the United States argued that Petitioner had *failed to state a claim for contribution* because "[t]here can be no contribution against a defendant who is immune against a direct suit by the plaintiff." DE 392 at 10 (citation omitted). That argument fails two ways.

*First*, Singapore law applies to "all substantive matters of liability and the availability and calculation of damages in this case." DE 247 at 1. And the default rule under the Singapore Maritime Conventions Act 1911 (MCA) (A-1273-1280) is that contribution for personal injury is available in maritime collision actions. MCA § 3(1). Although the MCA limits contribution in instances where damages "could not … have been recovered in the first instance as damages by the persons entitled to sue therefor," § 3(2), under the Singapore State Immunity Act 1979 (SSIA) (A-2760-2776), foreign states are *not immune* to death or personal injury claims, § 7(a) ("A State is not immune as respects proceedings in respect of … death or personal injury ….."). Moreover, foreign states waive sovereign immunity by the act of instituting

or intervening in proceedings, as the United States has here. SSIA § 4(3) ("A State is deemed to have submitted [to jurisdiction] — (a) if it has instituted the proceedings; or (b) … if it has intervened or taken any step in the proceedings."). Therefore, the Sailor-Claimants *can* sue the United States "in the first instance" under Singapore law, so Petitioner can seek contribution under Singapore law. MCA § 3(1)-(2). The United States did not contest—or even address—these arguments below, which were supported by Petitioner's Singapore law expert. A-2650-3208.

*Second*, even if U.S. general maritime law did apply, the *Feres* doctrine would not bar the Sailor-Claimants' claims against the United States in these circumstances. For all the reasons explained above, the district court's primary rationale for applying the doctrine—preserving "military discipline"—makes no sense where the United States invokes the district court's jurisdiction, and waives its immunity to third-party claims, by filing an affirmative claim against a private shipowner. And this Court shouldn't extend *Feres* any further, for the reasons already stated.

The district court did not address these issues below, instead concluding that the United States is immune to Petitioners' contribution claim—which is a different question from whether Petitioner properly stated a con-

tribution claim in light of the United States' supposed immunity to the *Sailor-Claimants'* claims. As a pure question of law, this Court may decide it in the first instance. *See Bugliotti v. Republic of Argentina*, 952 F.3d 410, 413-14 (2d Cir. 2020). But because the United States' position raises questions of the foreign law that the district court never addressed, the Court may exercise its discretion to remand these issues to the district court. *See id.*

# CONCLUSION

The Court should *vacate* the district court's order and final judgment denying Petitioner's petition for limitation of liability and exoneration, *vacate* the district court's apportionment of fault, *reverse* the district court's dismissal of Petitioner's counterclaim, and *remand* for further proceedings.

Respectfully submitted,

Dated: February 3, 2023

/s/ *David J. Weiner*

David J. Weiner
Stephen K. Wirth
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, DC 20001
(202) 942-5000
david.weiner@arnoldporter.com

Thomas H. Belknap, Jr.
Alan M. Weigel
BLANK ROME LLP
1271 Avenue of the Americas,
New York, NY 10020
(212) 885-5270
thomas.belknap@blankrome.com

*Counsel for Energetic Tank, Inc.*

# CERTIFICATE OF COMPLIANCE

I certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and this Court's order of January 27, 2023, that the foregoing brief contains 17,999 words and complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word, in 14-point Century font.

Dated: February 3, 2023            */s/ Stephen K. Wirth*
                                            Stephen K. Wirth